UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AWGI, L.L.C.; Atlas Logistics, Inc.; and
Atlas Van Lines, Inc.,

       Plaintiffs,

v.                                Case No. 17-12131

Atlas Trucking Company, L.L.C.; Atlas      Sean F. Cox
Logistics, L.L.C.; and Eaton Steel Bar     United States District Court Judge
Company, Inc.,

       Defendants.

_____/

## OPINION AND ORDER ON PENDING MOTIONS; FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

In this trademark infringement action, affiliated companies that provide transportation and logistics services have sued similar companies associated with a steel manufacturer. Plaintiffs and Defendants advertise themselves to consumers using the word "Atlas." Plaintiffs—who have various federal trademark registrations that incorporate the word "Atlas" and who have been operating under the "Atlas brand" for decades—contend that the Defendants' use of "Atlas" in the transportation and logistics industry violates their trademark rights. Defendants have countersued for unfair competition and false designation of origin, and ask the Court to cancel one of Plaintiffs' federal trademark registrations.

This case proceeded to a seven-day bench trial, during which the Court was able to consider all admitted evidence and assess the witnesses' credibility. During and after the trial, the parties filed several motions, some of which remain pending.

The Court now resolves all pending motions and announces its findings of fact and conclusions of law. For the reasons below, the Court **DENIES** Defendants' motion to strike the

expert testimony of Krista Holt (ECF No. 147); **DENIES** Plaintiffs' motion for Judgment for Partial Findings under Fed. R. Civ. P. 52(c); and **DENIES** Defendants' motion for leave to file objections to Plaintiffs' proposed findings of fact and conclusions of law. (ECF No. 162).

Further, for the reasons below, the Court **FINDS** in favor of Plaintiffs and **AGAINST** Defendants on Plaintiffs' Counts I, II, III, and IV, and Defendants' Counterclaims I and III.[1] In a separate filing, the Court will permanently enjoin Defendants from using specific "Atlas" marks in the transportation or logistics industries.

## PROCEDURAL BACKGROUND

On June 29, 2017, AWGI, L.L.C., Atlas Logistics, Inc., and Atlas Van Lines, Inc., ("Plaintiffs") filed its complaint against Atlas Trucking Company, L.L.C., Atlas Logistics, L.L.C., and Eaton Steel Bar Company, Inc. (ECF No. 1). Plaintiffs' suit is based on their four federally registered trademarks:

| Mark | Registration No. | Services |
|---|---|---|
| ATLAS | 3,718,117 | **IC 039**: Freight forwarding services; Transportation of household goods |
| ATLAS LOGISTICS | 4,737,616 | **IC 035**: Business management consultancy in the field of transport and delivery; Providing electronic tracking of freight information to others for business administration purposes; Providing tracking services and information concerning tracking of assets |

---

[1] Plaintiffs' Count VI (trademark counterfeiting) also proceeded to trial, but Plaintiffs provided no evidence or argument related to that claim. Accordingly, the Court finds that Plaintiffs have abandoned it.

2

| | | |
|---|---|---|
| | | in transit, namely, vehicles, trailers, divers, cargo and delivery containers for business inventory purposes; Transportation logistics services, namely, arranging the transportation of goods for others **IC 039**: Distribution services, namely, delivery of restaurant equipment, namely, tables, chairs, booths and shelving; Distribution services, namely, delivery of healthcare facility furniture and equipment, namely, hospital beds, overhead tables, lockers, office furniture and shelving; Distribution services, namely, delivery of fine arts; Transport of general commodities and special products by truck and/or motor van, train, air and ocean; Transportation and storage of goods; Warehousing information; Warehousing services |
|  2 | 3,137,526 | **IC 025**:  Clothing,  namely hats and shirts **IC 026**:  Cloth  patches  for clothing |

---

[2] The Court refers to this mark as the "flying A," which is how it was referred to by the parties at trial.

| ATLAS--THE AGENTS' VAN LINE | 1,591,344 | **IC 039**: Transportation of household goods by motor van |
|---|---|---|

Compl. ¶ 23 (ECF No. 1, PageID 4-5).

      Plaintiffs' complaint has seven counts: (1) trademark infringement of the "Atlas" mark; (2) trademark infringement of the "Atlas Logistics" mark; (3) trademark infringement of the flying A mark; (4) trademark infringement of the "Atlas--The Agents' Van Line" mark; (5) trademark counterfeiting of the "Atlas" mark; (6) trademark counterfeiting of the "Atlas Logistics" mark; and (7) common law unfair competition. Compl. ¶ 43-69 (ECF No. 1, PageID 10-13).[3]

      On August 1, 2017, Defendants filed their answer with affirmative defenses. (ECF No. 11). On September 22, 2017, the Court entered a scheduling order that allowed discovery through March 31, 2018. (ECF No. 19).

      On December 22, 2017, Defendants filed a motion for leave to file counterclaims. (ECF No. 21). When this motion was fully briefed, (ECF Nos. 22 and 23), the Court referred it to Magistrate Judge David R. Grand. (ECF No. 24). Judge Grand held a hearing, and granted leave for Defendants to file counterclaims. (ECF No. 28). Thereafter, Defendants filed three counterclaims: (1) unfair competition and false designation of origin under the Lanham Act; (2) common law unfair competition; and (3) declaratory injunction regarding cancellation of

---

[3] In this opinion, the Court will refer to Plaintiffs' counts as delineated in this paragraph. For example, their trademark infringement claim for the "Atlas" mark is "Count I;" their trademark infringement claim for "Atlas Logistics" is "Count II," and so on.

Plaintiffs' "Atlas Logistics" trademark registration.[4] (ECF No. 27, PageID 229-232).[5]  On March 7, 2018, Plaintiffs filed their answer and affirmative defenses to Defendants' counterclaims. (ECF No. 34).

As discovery neared its end, the parties filed various substantive motions.[6] On February 20, 2018, Defendants filed a motion for summary judgment. (ECF No. 29). Plaintiffs responded to this motion (ECF No. 35), and Defendants replied. (ECF No. 38). On March 16, 2018, Defendants filed a motion to strike Plaintiffs' damages claims. (ECF No. 37). Plaintiffs responded to this motion (ECF No. 37), and Defendants replied. (ECF No. 44). On April 9, 2018, the Court held a status conference, and thereafter referred Defendants' motion to strike to Judge Grand. (ECF No. 48).

On April 26, 2018, the Court entered a stipulated order that extended certain filing deadlines and extended the deadline for certain discovery until July 15, 2018. (ECF No. 51).

On April 30, 2018, Judge Grand granted Defendants' motion to strike in part and denied it in part. (ECF No. 52). As Judge Grand's order makes clear, by the time it was issued, Defendants

---

[4] The Court considers Counterclaim III to be relief that Defendant seeks, not a standalone cause of action.

[5] In this opinion, the Court will refer to Defendants' counterclaims as delineated in this sentence. For example, the statutory unfair-competition-and-false-designation claim is "Counterclaim I," the common law unfair-competition claim is "Counterclaim II," and so on. *See* FN 2.

[6] The parties also filed various procedural motions. For example, on February 28, 2018, Plaintiffs filed a motion to extend time to serve their rebuttal expert report, (ECF No. 31), which the Court granted after a hearing. (ECF No. 36). *See also*, ECF Nos. 40, 57, 59, 60, 62, 63, 64.  Most—if not all—of these motions were fully briefed before being decided.

"no longer [sought] an order striking [Plaintiffs'] damages claims." (ECF No. 52, PageID 1173). Rather, this order dealt mainly with various discovery matters.

On May 4, 2018, Plaintiffs filed a motion for partial summary judgment. (ECF No. 53). Defendants responded (ECF No. 58), and Plaintiffs replied. (ECF No. 61).

Because of several ancillary issues surrounding the then-pending motions for summary judgment,[7] the Court ordered the parties to file condensed motions by August 31, 2018. (ECF No. 67). The Court terminated the then-pending motions for summary judgment.

On August 31, 2018, the parties filed their new motions for summary judgment. (ECF Nos. 70 and 71). Each side responded to the other's motion (ECF Nos. 76 and 77), and filed a reply in support of its own motions. (ECF Nos. 79 and 80).

Generally, Plaintiffs' motion for summary judgment argued that Counterclaims I and III (the Lanham Act claims) were barred by laches and that Counterclaim II (the common law claim) was barred by the statute of limitations. Plaintiffs also argued that Defendants' use of the term "Atlas" was likely to cause consumer confusion as to its four federally registered trademarks, and that, under trademark and common-law principles such as tacking and the "zone of natural expansion," it must prevail on its "Atlas Logistics" claim as the senior user.

Generally, Defendants' motion for summary judgment argued that Plaintiffs' claims were barred by laches, that there was no likelihood of consumer confusion as to the flying A, "Atlas," and "Atlas--the Agents' Van Line" marks, and that they were the senior users of the "Atlas Logistics" mark.

---

[7] *See, e.g.*, ECF Nos. 57, 62, 63, 64, 65, and 66.

6

On December 6, 2018, the Court appointed Mr. Christopher G. Darrow to serve as mediator in this matter, pursuant to Local Rule 16.4. (ECF No. 86).

On January 4, 2019, the Court held a hearing on the motions for summary judgment. On March 25, 2019, the Court issued an Opinion and Order, wherein it granted summary judgment in favor of Defendants on Plaintiffs' claims, dismissed Defendants' Counterclaim II, and concluded that there was a genuine issue of material fact underlying Counterclaim I and III. (ECF No. 90); *AWGI, L.L.C. et. al., v. Atlas Trucking Co., L.L.C., et. al.*, 381 F.Supp.3d 832 (E.D. Mich. 2019).

Specifically, the Court concluded that "(1) Defendants' Lanham Act counterclaims were not barred by laches; (2) Plaintiffs' Lanham Act claims were barred by laches to the extent they sought past money damages; (3) Plaintiffs' Lanham Act claims failed on the merits to the extent that they sought injunctive relief; (4) the common law unfair competition claim and counterclaim were barred by the statute of limitations, and (5) a jury should decide who is the senior user of the "Atlas Logistics" mark. (ECF No. 90, PageID 3771); *AWGI*, 381 F.Supp.3d at 852.

On April 22, 2019, Plaintiffs filed a motion for reconsideration of the Court's March 25, 2019 Opinion and Order. (ECF No. 96). The Court ordered Defendants to respond, which they did. (ECF No. 100).

On April 24, 2019, Plaintiffs appealed the Court's March 25, 2019 Opinion and Order to the United States Court of Appeals for the Sixth Circuit. (ECF No. 98); *AWGI LLC, et. al., v. Atlas Trucking Co., et. al.*, Case No. 19-1449 (6th Cir. opened April 26, 2019). The Sixth Circuit held the appeal in abeyance because Plaintiffs' motion for reconsideration was pending.

On May 30, 2019, the Court ordered supplemental briefing on one issue:

Given that the parties conceded that their common usage of "Atlas Logistics" causes a likelihood of confusion, does the Court's conclusion that there is a fact issue as to who has priority to the "Atlas Logistics" mark (ECF No. 90, PageID

7

3769-3770) require the survival of not only Defendants' Lanham Act Counterclaims, but also Plaintiffs' Count II?

(ECF No. 103, PageID 3927). The parties filed supplemental briefing on this issue. (ECF No. 104 and 105).

On July 3, 2019, the Court issued an Opinion and Order on Plaintiffs' motion for reconsideration. (ECF No. 106); *AWGI, LLC, et. al. v. Atlas Trucking, Co*., *LLC*, 2019 WL 2866093 (E.D. Mich. July 3, 2019). The Court granted Plaintiffs' motion to the extent that it reinstated Counts I, II, III, IV, and VI. The Court reached this conclusion for two reasons. First, the Court reasoned that, because it had previously concluded that there was a genuine issue of material fact as to whether Plaintiffs had priority to the "Atlas Logistics," mark by virtue of tacking to their "Atlas" mark, Count I necessarily must survive summary judgment. (ECF No. 106, PageID 3946-3947); *AWGI*, 2019 WL 2866093 at \*2. Second, the Court concluded that, upon reconsideration, the likelihood-of-confusion factors were "evenly balanced" and that there were genuine issues of material facts underlying certain factors. (ECF No. 106, PageID 3949-3953); *AWGI*, 2019 WL 2866093 at \*4-\*6.[8]

On July 10, 2019, the Sixth Circuit granted Plaintiffs' motion to voluntarily dismiss their appeal pursuant to Fed. R. App. P. 42(b). (ECF No. 107).

---

[8] The Court denied Plaintiffs' motion for reconsideration to the extent it sought reconsideration of the Court's conclusion regarding Count V and the Court's conclusion regarding the applicability of laches to this case. (ECF No. 106, PageID 3953-3955); *AWGI*, 2019 WL 2866093 at \*6-7. The Court also ruled that Defendants were not entitled to invoke equitable estoppel to preclude Plaintiffs from seeking post-complaint money damages and injunctive relief. (ECF No. 106, PageID 3947-3948); *AWGI*, 2019 WL 2866093 at \*3. On November 26, 2019, Defendants waived any right they had to present an equitable estoppel defense at trial. (ECF No. 133).

On August 19, 2019, the parties filed two significant stipulations. First, the parties waived "any right they may have to a jury trial on all claims, counterclaims, and defenses." (ECF No. 110, PageID 4036). Second, the parties withdrew "all requests for monetary relief, including but not limited to requests for damages, disgorgement of profits, attorneys' fees and costs." *Id*. In other words, the parties agreed that the case would proceed to a bench trial, and that the prevailing party would only receive injunctive relief. The Court entered a stipulated order consistent with these agreements. (ECF No. 111).

On August 26, 2019, the Court held a final pre-trial conference. At this conference, the Court indicated that it was inclined to appoint Mr. Darrow as a technical advisor to the Court in this matter, and asked if any of the parties objected to this appointment. No party objected to Mr. Darrow's appointment. Mr. Darrow's appointment, and the parties' agreement to it, was placed on the record:

| | |
|---|---|
| The Court: | And I'd also like to have Mr. Darrow serve as a technical advisor to the Court. Is that agreeable to the plaintiff ? |
| Plaintiffs' Counsel: | Yes, Your Honor. |
| The Court: | Defense? |
| Defendants' Counsel: | Yes, Your Honor. |

Final Pretrial Conference Tr. 5:17-22 (ECF No. 145, PageID 4627). The Court issued a written order appointing Mr. Darrow. (ECF No. 113). The Court also issued an order regarding bench trial, which set deadlines for motions *in limine* and set the trial date of January 21, 2020. (ECF No. 114).

On October 18, 2019, Defendants moved to terminate Mr. Darrow's appointment. (ECF No. 116). Plaintiffs responded, (ECF No. 118), and Defendants replied. (ECF No. 119). On November 22, 2019, the Court denied this motion. (ECF No. 128).

Before trial, the parties filed a total of eight motions *in limine*. (ECF Nos 120, 121, and 123).[9] Generally, Plaintiffs moved (1) to bar Defendants from calling Plaintiffs' lead trial counsel to testify, and (2) to prevent Defendants from reading a deposition into evidence because the deponent would testify live at trial. Generally, Defendants moved (1) to exclude any evidence regarding the public's perception of Plaintiffs' marks; (2) to exclude any evidence regarding "actual confusion"; (3) to exclude evidence regarding Plaintiffs' advertising expenditures; (4) to preclude Plaintiffs from asserting that they haul steel; (5) to exclude the expert testimony of Krista Holt; and (6) to exclude a magazine article regarding an award Plaintiffs allegedly won. Each side responded to the other's motions (ECF Nos. 129, 130, 131), and filed replies in support of their own motions. (ECF Nos. 136, 137, 138). The Court heard oral arguments on these motions on December 12, 2019.

On December 30, 2019, the Court issued its Opinion and Order on the motions *in limine*. (ECF No. 142).

On January 21, 2020, the bench trial began. Plaintiffs' case-in-chief lasted roughly three-and-a-half days, and consisted of testimony from five witnesses: Phillip Wahl, Stacie Banks, Mary Beth Johnson, Ryan McConnell, and Krista Holt. The Court will provide a brief synopsis of each witness's testimony.[10]

---

[9] Defendants' six motions *in limine* were all included in one document.

[10] To be clear, what follows are simply synopses of the witnesses' testimony. They are not intended to be comprehensive or exact. To the extent that anything in a synopsis is inconsistent with anything in the Court's Findings of Fact and Conclusions of Law, the Findings of Fact and Conclusions of Law control.

**Phillip Wahl**

Phillip Wahl is the President and Chief Operating Officer of Plaintiff Atlas Logistics, Inc. Wahl has worked at an Atlas-affiliated company since 1989. In that time, the Atlas family of companies has continuously used the mark "Atlas" to offer logistics services. Wahl defined "logistics" as the "arrangement and services required to move product from one place to another" and explained that this included scheduling, arranging appropriate trailers, loading, and unloading. He described two subspecies of logistics that Atlas performs: (1) brokerage services, where Atlas arranges a delivery by a third-party service provider and ensures compliance with the delivery contract's terms; and (2) freight forwarding, where Atlas takes possession of the property and completes the delivery itself. Although most of Atlas's revenue is derived from moving household goods, it has provided logistics services for non-household goods since at least 1989 through its "Specialized Products" and "Commercial Truck Load" divisions. Wahl also asserted that Atlas can, and would, move steel products if given the opportunity. Atlas does not, however, specifically market to consumers that need to ship steel.

Trial Tr. vol. I, 28-138 (ECF No. 148, PageID 4664-4774); vol. II, 7-21 (ECF No. 149, PageID 4784-4798).

**Stacie Banks**

Stacie Banks joined Atlas Van Lines in 2002 and is currently the Vice President of Finance for Van Lines, Atlas Logistics, and other Atlas affiliates. Banks testified that the Atlas family of companies has derived $11 billion of revenue while using its "Atlas" marks since 2006. She also testified that Atlas has spent $32 million on advertising since 2006.

Trial Tr. vol. II, 21-35 (ECF No. 149, PageID 4798-4812).

**Mary Beth Johnson**

Mary Beth Johnson is the Vice President of Corporate Marketing for Atlas Van Lines. She is responsible for marketing the Atlas family of companies. Plaintiffs' marketing "casts a wide net," and Johnson's mission is to ensure that "anyone who considers moving anything anywhere considers Atlas." In 2019, Plaintiffs spent roughly $2 million to promote the "Atlas" brand through websites, print media, internet searches, trade shows, and other media. Johnson testified that Plaintiffs consider "Atlas" to be the dominant aspect of their brand, and that all other add-ons (e.g. "Van Lines," "Logistics," "Travel," "Terminal," etc). are descriptive of niche services. This practice is common within the trucking and logistics industries.

Johnson testified that Plaintiffs have offered logistics services since at least 1981. She compared Plaintiffs' recent emphasis on the word "logistics" to a marketing shift that General Mills has promoted for Cheerios in recent years. In Johnson's words, Cheerios has always been gluten-free, but General Mills only added that phrase to their marketing campaigns once gluten-free became a buzzword to their consumers. In the same way, Atlas only began highlighting the word "logistics" once that became a buzzword that its customers cared about.[11] Johnson also testified that Atlas owns about 300 trailers, and that

---

[11] Although Ms. Johnson's analogy to Cheerios and the gluten-free movement is illustrative, it may not be technically correct. *See* https://www.cheerios.com/gluten-free/ (last accessed March 27, 2020) (describing how Cheerios has "worked hard to remove stray wheat, rye, and barley grain from [its] oat supply," and stating that "[n]*ow* Cheerios still have the same great taste, but they're also gluten-free.") (emphasis added). Still, the analogy is helpful in understanding Plaintiffs' marketing shifts.

Atlas's network of agents own another 3,000 trailers. Atlas has at least three agents who operate in the Detroit area.

Trial Tr. vol. II, 35-92 (ECF No. 149, PageID 4812-4869).

**Ryan McConnell**

Ryan McConnell is the Vice President of Strategic Planning at Atlas Van Lines. He has worked at Atlas since 1994. Most of Plaintiffs' business is focused on moving household goods. In 2016, Van Lines earned $800 million in revenue. Of that, $670 million came from moving household goods. And 90% of Plaintiffs' agents focus on moving household goods.

Although household moving is Plaintiffs' focus, they regularly move non-household goods, such as weightlifting equipment, exhibits and furnishings for trade shows, hospital equipment, shingles, and heavy machinery. McConnell described several specific non-household moves that Plaintiffs have coordinated in the past, including the relocation of Nissan's headquarters, the shipment of motorcycles for a Harley Davidson exhibition and show, the shipment of "start-up kits" for BJ's Brewhouses, and the shipment of parts for the Space Shuttle.

Plaintiffs do not specifically target the steel-shipping market. Rather, Plaintiffs consider steel to be a "general commodity," and that any marketing toward the steel industry would fall within their general marketing scheme. Plaintiffs also market for "general commodities" through load boards and face-to-face interactions. McConnell testified that, although he cannot say whether Plaintiffs have ever shipped steel, they would be able to do so (or would be able to arrange such a shipment) if asked. Plaintiffs are always expanding, and are specifically interested in new mergers and acquisitions that would place

13

them in market areas that are "adjacent" to their current niche specialties. And, Plaintiffs do not limit Atlas Logistics's brokerage opportunities.

McConnell also described an apparent incident of actual confusion. In 2016, a driver contacted Plaintiffs' recruiting department to inquire about a job. Plaintiffs' recruiters directed the driver to fill out an application. After Plaintiffs did not receive an application, they reached back out to the driver. After some investigation, Plaintiffs concluded that the driver had mistakenly filled out, and submitted, an application with Defendants.

Trial Tr. vol. II, 94-146 (ECF No. 149, PageID 4871-4923); vol. III, 4-88 (ECF No. 150, PageID 4928-5012).

**Krista Holt**

Krista Holt is a Managing Director at EconOne, a research consulting firm. She oversees EconOne's survey practice. She was hired by Plaintiffs to perform an "initial interest survey" based on internet search results. Her survey targeted recent and future consumers of freight hauling services. She received 230 respondents: 51 were from Michigan. The respondents were split roughly in half into a "test group" and a "control group." Each group was shown the results page of a web-search for "atlas logistics." This page showed both the Plaintiffs' and Defendants' website. The only difference between the page that the "test group" was shown and the page that the "control group" was shown was that Defendants' webpage was titled "arcade logistics" in the control group's results. Holt chose the word "arcade" because it began with "a" and had two syllables.

Holt's survey showed that 21% of the test group thought that Plaintiffs and Defendants' websites were somehow affiliated, and that 2% of the control group thought

14

that Plaintiffs' website was affiliated with the "arcade logistics" website. Once this 2% "noise" figure was subtracted from the test group, Holt concluded that there was a 19% confusion rate between Plaintiffs' website and Defendants' website.

Trial Tr. vol. III, 89-134 (ECF No. 150, PageID 5013-5058); vol. IV, 6-62 (ECF No. 154, PageID 5077-5133)

On January 27, 2020, Plaintiffs turned the presentation of proofs over to Defendants, who called four witnesses over roughly two-and-a-half days: David Neal, Mark Goodman, Jeffrey Bronson, and David Gunsberg.  The Court will provide a brief synopsis of each witnesses' testimony.[12]

**David Neal**

Dr. David Neal is the founder and managing partner of Catalyst Behavioral Sciences. Defendants hired Neal as an expert to challenge Holt's conclusions regarding the confusion rate among prospective consumers of freight-hauling services. Neal testified that Holt's survey has several "fatal flaws" that "irredeemably" harm its results. First, both the test group and the control group had to input "atlas logistics" which contaminated the results. Second, Holt tested the Plaintiffs' market and consumer base, not the Defendants' market and consumer base. Neal testified that these and other flaws destroyed the reliability of Holt's results.

Trial Tr. vol. IV, 63-141 (ECF No. 154, PageID 5134-5212); vol. V, 7-28 (ECF No. 155, PageID 5220-5241).

---

[12] *See* Footnote 10.

**Mark Goodman**

Mark Goodman is the co-CEO of Eaton Steel Corporation and Eaton Steel Bar Company, and the co-managing member of Atlas Trucking. Eaton's steel companies were founded by Goodman's father and uncle in 1953. The Eaton family of companies include Eaton Steel Corporation, Eaton Steel Bar Company, Hercules Drawn Steel, Atlas Trucking, Atlas Logistics, Titan Metallurgy, and Apollo Heat Treating. The Eaton family of companies focuses its operation on the "Rust Belt," which Goodman defined as Western Illinois to Eastern Pennsylvania, and Northern Michigan to Texas. Goodman testified that he is in the process of preparing the Eaton companies for the next generation, and that he would like the companies to expand.

In 1997, Eaton began having trouble ensuring that their products reached their customers. To solve this problem, Goodman created Atlas Trucking. Goodman chose the name "Atlas," in accordance with a Greek mythological naming convention that his father and uncle started (e.g. Hercules, Titan, and Apollo).

Even though Atlas Trucking is distinct from Eaton, it prioritizes Eaton shipments over all else. In fact, when shipping Eaton goods, Atlas Trucking operates on a "net freight," which means that it makes no profit. Atlas Trucking primarily operates flatbed trucks, but does own three dry vans. Atlas Trucking primarily hauls steel or steel products, but does haul non-steel goods (such as sod or lumber), usually on back hauls.

In 2003, Goodman formed Atlas Logistics, which is a brokerage company that arranges outside loads for Atlas trucks. Goodman's family tax attorney searched the State of Michigan's business licensing database and did not find any other company operating

as "Atlas Logistics." When Goodman chose the name "Atlas Logistics," he was aware of Plaintiff Atlas Van Lines.

Trial Tr., vol. V, 29-63 (ECF No. 155, PageID 5242-5276).

**Jeff Bronson**

Jeff Bronson is the Senior Director of Transportation for Atlas Trucking and Atlas Logistics.  He oversees all day-to-day operations at these companies. Atlas Trucking owns 79 flat-bed trucks, 2 stake trucks, and 3 dry vans. Atlas Trucking employs 81 drivers, about half of whom own their own trucks. The rest rent an Atlas truck. Bronson considers Atlas to be a "flat-bed specialist." He testified that Atlas uses the dry vans primarily for a specific customer whose loading dock requires them.

Bronson testified that the Eaton family of companies is, by far, Atlas's biggest customer. Another significant portion of customers get referred to Atlas from some other Eaton Company. Atlas gets other customers through load boards and direct marketing (i.e. "hitting the phones and hitting the street"). Bronson testified that he does not consider Atlas's websites to be advertising.

The Atlas companies need "back hauls" to remain profitable and to retain their drivers. Atlas prioritizes back-haul shipments for Eaton Steel. If no Eaton Steel shipments are available, Atlas would prefer to ship steel products, but is willing to ship any commodity that (1) matches the trailer; (2) falls within its authorities; (3) falls within its insurance; and (4) has been previously hauled by the driver.

The Atlas companies receive about 78,000 calls a year. During this litigation, Atlas began monitoring its calls, and recorded four instances where a caller was actually seeking the Plaintiffs.

Bronson also that testified Atlas was seeking to expand in the areas that it currently provides services.

Trial Tr. vol. V, 63-157 (ECF No. 155, PageID  5276-5370); vol. VI, 6-50 (ECF No. 156, 5377-5421).

**David Gunsberg**

David Gunsberg is the General Counsel, Vice President of Human Resources, and Vice President of Strategic Planning for Eaton Steel. Gunsberg testified that Atlas received a cease-and-desist letter from Plaintiffs in January 2012. In response to that letter, Gunsberg searched a national trademark database, and discovered that "Atlas" was used in relation to thousands of entries, and that it was used alone for hundreds of entries. He also searched the SAFER database and found that "Atlas" was used in the name of many companies in the transportation industry. Based on this research, he concluded that "Atlas" was not a strong mark.

Trial Tr. vol. VI, 50-120 (ECF No. 156, PageID 5421-5491).

On January 31, 2020, Defendants rested their case. At the close of Defendants' case, Plaintiffs orally moved for Judgment for Partial Findings under Fed. R. Civ. P. 52(c). Trial Tr. vol. VI, 120 (ECF No. 156, PageID 5491). The Court took that motion under advisement and ordered briefing on that issue. *Id*. Plaintiffs never filed a written motion.

Plaintiffs called one rebuttal witness: Phillip Wahl. Here's a synopsis of Wahl's rebuttal testimony.[13]

---

[13] *See* Footnote 10.

18

**Phillip Wahl**

In rebuttal, Wahl testified that Plaintiffs ship some of the same goods as Defendants (auto parts, glass, shingles, etc).; that Plaintiffs have the same or similar shipping abilities as Defendants; and that Plaintiffs have over 50 customers in common with Defendants. Trial Tr. vol. VI, 122-141 (ECF No. 156, PageID 5493-5512).

During trial, Defendants orally moved to strike the testimony of Plaintiffs' expert Krista Holt. The Court ordered briefing on this issue. (ECF No. 147, 152, 158). That motion remains pending, and will be resolved below. For their part, Plaintiffs moved to strike the testimony of Defendants' expert Dr. David Neal, Trial Tr. vol. IV, 86-87 (ECF No. 154, PageID 5157-5158), but the Court denied that motion from the bench. Trial Tr. vol. IV, 87 (ECF No. 154, PageID 5158).

After closing arguments, Trial Tr. vol. VII (ECF No. 157), the Court ordered the parties to submit proposed findings of fact and conclusions of law. (ECF No. 153).[14] On March 5, 2020, each side submitted its proposed findings and conclusions. (ECF Nos. 160 and 161).

On March 16, 2020, Defendants moved for leave to file objections to two statements made in Plaintiffs' proposed findings, arguing that these statements were not supported by the relevant citations. (ECF No. 162).   On March 18, 2020, Plaintiffs responded, agreeing with one of Defendants' objections and disagreeing with the other. (ECF No. 163).

---

[14] After this order, the parties stipulated to one correction of the trial transcript. (ECF No. 159). The Court entered a stipulated order that corrected Trial Tr., vol. IV, 87:17 to read "'is qualified . . .,' instead of "isn't qualified . . .'" (ECF No. 159, PageID 5603). Also, before closing arguments, the parties agreed to one other transcript correction: Trial Tr. vol. II, 49:6-11 should refer to Exhibit S2, not Exhibit F2. Trial. Tr. vol. VII, 12:15-24 (ECF No. 157, PageID 5530).

<strong>RESOLUTION OF PENDING MOTIONS</strong>

Now that the Court has detailed the background of this case, it turns to the three motions that remain pending.

**I.      Plaintiffs' Motion for Judgment for Partial Findings under Fed. R. Civ. P. 52(c).**

At the end of Defendants' case, Plaintiffs moved for "judgment for partial findings under" Rule 52(c). (ECF No. 156, PageID 5491). Plaintiffs provided no argument when they made this oral motion. The parties agreed to submit briefing on this motion. (ECF No. 156, PageID 5491-5492). No written briefs were filed. To the extent this motion sought anything besides the relief granted in this Opinion and the Court's Findings of Fact and Conclusions of Law, the Court **DENIES** it as abandoned.

**II.     Defendants' Motion to Strike the Expert Testimony of Krista Holt**

Defendants have moved to strike the testimony of Plaintiffs' expert Krista Holt. After their oral motion at trial, they filed a written motion. (ECF No. 147). Plaintiffs responded (ECF No. 152), and the Defendants filed a reply. (ECF No. 158).

"District court judges must determine whether an expert's testimony is both relevant and reliable when ruling on its admission." *Clay v. Ford Motor Company*, 215 F.3d 663, 667 (6th Cir. 2000).  A trial judge's determinations regarding the admissibility of expert testimony are guided by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Rule 702 of the Federal Rules of Evidence governs testimony by experts and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

20

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert,* the trial court acts as a "gatekeeper" that ensures that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert* sets forth a nonexclusive list of factors relevant to this inquiry: (1) whether the theory or technique can be or has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S at 593-94.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court confirmed that "the general gatekeeping obligation set forth in *Daubert*" "applies when considering all expert testimony, including testimony based on technical and other specialized knowledge." *Clay*, 215 F.3d at 667.  "It further held that the specific *Daubert* factors— testing, peer review and publication, potential rate of error, and general acceptance in the relevant community—may be considered by the district court even when the proffered expert testimony is not scientific." *Id*.  Whether these specific factors are reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. *Id.*

"It is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert,* 509 U.S. at 592 n.10).  A district court is not obligated to hold a formal *Daubert* hearing when an expert's testimony is challenged. *See Clay*, 215 F.3d at 667; *Nelson*, 243 F.3d at 249.

In Defendants' written motion, they argue that Holt used the wrong stimulus. According to Defendants, Holt should have used "Atlas Logistics," not "Atlas," when questioning respondents about their perception of the companies' relationship. Because there is no dispute that the simultaneous use of "Atlas" by the Plaintiffs and Defendants causes a likelihood of confusion, Defendants believe that Holt's survey is irrelevant. And, as evidenced by Neal's testimony, Plaintiffs believe that Holt's survey is otherwise plagued by fatal flaws that irreconcilably destroy its reliability.

The Court has considered the arguments made by Defendants regarding Holt's testimony. The Court concludes that these arguments persuasively diminish the weight that the Court will afford to Holt's expert testimony, but do not persuade the Court that Holt's opinions should be excluded as irrelevant or unreliable. Accordingly, the Court **DENIES** Defendants' motion to strike Holt's testimony.

The Court will consider Holt's survey and testimony in its findings of fact and conclusions of law.  However, the Court gives this expert testimony only little weight, and considers it non-dispositive of any issue in this case, even considering it together with other evidence. Rather, the Court will consider it only for what it is: a survey that found that 19% of respondents thought that there may be some relationship between Plaintiffs and Defendants' website based on one, general internet search.

## III.   Defendants' Motion for Leave to File Objections to Plaintiffs' Proposed Findings

Defendants have filed a motion for leave to file objections as to "unsupported statements" in Plaintiffs' proposed findings of fact and conclusions of law. (ECF No. 162).  Defendants object to two statements: First, Defendants object to Proposed Paragraph 156, which reads "[t]he parties have stipulated that Plaintiffs used ATLAS for Transportation and Logistics services before

22

Defendants used ATLAS for those Services." Second, Defendants object to Proposed Paragraph 257, which reads "[t]he USPTO Examining Attorney, however, did not reject Plaintiff's argument. Instead, she said only the argument is 'not relevant' because she 'has no authority to review or to decide on matters that constitute a collateral attack on the cited registration.'"

In response, Plaintiffs concede that Paragraph 156 should be revised to read "Defendants stipulated Plaintiffs used ATLAS before Defendants used the mark ATLAS Logistics. Plaintiffs used ATLAS for Transportation and Logistics Services before Defendants used ATLAS for those Services." (ECF No. 163, PageID 5790). But, they argue that Defendants' proposed objection to Paragraph 257 is just a reassertion of their "continuing disagreement with Plaintiffs' interpretation of the ATLAS LOGISTICS trademark registration prosecution." (ECF No. 163, PageID 5791).

The Court finds that the proposed objections would not be helpful for the resolution of this case. Plaintiffs' *proposed* Findings of Fact and Conclusions of Law are just that—*proposed*. The Court understands Defendants' problems with Paragraph 257, and will consider it in the findings of fact and conclusions of law. Although the Court notes that Plaintiffs have now revised their proposed Paragraph 156, it **DENIES** Defendants' motion. (ECF No. 163).[15]

---

[15] Plaintiffs also request that the Court order Defendants to reimburse them for fees and costs incurred in responding to this motion because Defendants' counsel allegedly violated Local Rule 7.1(a). Considering the circumstances of this motion—and its place in this three-year-old, hotly contested case that has seen nearly three dozen other motions, with a corresponding number of responses and replies—the Court declines to award fees or costs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Now that the pending motions have been resolved, the Court will issue its findings of facts and conclusions of law.[16]

Having heard and observed the witnesses who testified at trial (allowing for the Court to assess credibility), having considered the exhibits admitted, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law as to this matter.[17]

## FINDINGS OF FACT

### I.    The Plaintiffs

1.    Plaintiffs are a family of companies owned by Atlas World Group, Inc. Plaintiffs provide full-service transportation and logistics services throughout the United States. (Wahl, Trial Tr., vol. I, 36:21-25, 28:12-21)[18] "**Transportation Services**" means the beginning-to-end process of moving things from point A to point B, and "**Logistics Services**," means management of the movement of goods from one place to another, from origin to destination, and the management, including scheduling and the reporting, of that process along the way. (Wahl, Trial Tr., vol. I, 99:6-13); *see also* (Wahl, Trial Tr. vol. I, 41:2-23) ("Logistics services are the arrangement and the

---

[16] Mr. Darrow, the Court's appointed Technical Advisor, took no part in the Court's determination of these Findings of Fact and Conclusions of Law.

[17] To the extent that a finding of fact is more properly understood as a conclusion of law, and to the extent that a conclusion of law is more properly understood as a finding of act, it should be so understood.

[18] For ease of reference, the Court includes the name of the witness when citing trial testimony.

services required to move a shipment or move a product from one point to another. That would be the time that it has to be picked up, the time that it has to be delivered, the trailer requirements for that move; do you need a lift gate, do you need climate controlled, do you need equipment inside the trailer, such as blankets to wrap the product, straps to position it in the trailer and keep it secure, how much labor do you need to load the goods on and off the trailer. Those kinds of services are logistics services.")

2.      Transportation and Logistics Services are "the same" or at least "closely related" to each other, "intermingled, if you will" – "you can't really conduct transportation services without having some logistical element in it." (Bronson, Trial Tr. vol. V, 130:14-17; Johnson, Trial Tr. vol. II, 44:19-22; 40:2-15; 41:22-25). Indeed, "pretty much every moving company does logistics." (McConnell, Trial Tr. vol. II, 137:21-22).

3.      Plaintiffs market their services to everyone from homeowners who pay for their own move, to companies looking for niche logistics services, to customers seeking general transportation services. (Johnson, Trial Tr. vol. II, 37:10-19).

4.      Plaintiffs' customers include Echo Logistics, Coyote Logistics, Land Star, CH Robinson Worldwide Inc., Tata Steel, and Penske. (Wahl, Trial Tr. vol. VI, 126:23-127:7).

5.      When marketing Plaintiffs' services, Plaintiffs' mission is to "[make] sure that everyone, whoever considers moving anything, from anywhere to anywhere, thinks of ATLAS first[.]" (Johnson, Trial Tr. vol. II, 81:15-21).

6.      Plaintiffs continually grow and expand all facets of their businesses. (McConnell, Trial Tr. vol. III, 55:3-11). "[A]ll segments of [Plaintiffs'] business are in expansion mode." (McConnell, Trial Tr. vol. III, 55:9-11). For example, Plaintiffs recruit new agents to serve different types of services and locations, and continually look for merger and acquisition

opportunities into new market areas. Such growth and expansion is in service of improving Plaintiffs' existing businesses and adding related services that may be adjacent to Plaintiffs' current services. (McConnell, Trial Tr. vol. III, 58:10-60:8).

### a. Plaintiff AWGI, L.L.C.

7. AWGI, L.L.C. ("**AWGI**") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Evansville, Indiana. (ECF No. 112, PageID 4048).[19] AWGI is a holding company that owns the trademarks at issue in this lawsuit. (Exs. C, J, P, and S).

### b. Plaintiff Atlas Van Lines, Inc.

8. Atlas Van Lines, Inc. ("**Atlas Van Lines**") is a Delaware corporation with its principal place of business in Evansville, Indiana. (ECF No. 112, PageID 4049).

9. Atlas Van Lines was formed in 1948 and has, since then, continuously provided Transportation and Logistics Services. (Wahl, Trial Tr. vol. I, 28:22-29:20).

10. Although Plaintiffs have provided Logistics Services since the 1940s, Plaintiffs began putting more emphasis on marketing their Logistics Services in 2007. (Wahl, Trial Tr. vol. I, 70:7-17). ("In 2007, at the time the economy went into the recession, the logistics market was retracting somewhat, and one of the things that Atlas identified that we needed to do was start marketing ourselves, putting the logistics out there in our marketing materials. Our competition was doing that. Logistics was . . . starting to become kind of a buzzword in the industry, and we wanted to put that out in the market as well.")

---

[19] ECF No. 112 is the Joint Final Pretrial Order, wherein the parties stipulated to certain undisputed facts.

26

11.     Atlas Van Lines is authorized to provide Transportation and Logistics Services through its interstate motor carrier transportation and brokerage authority from the Federal Motor Carrier Safety Administration ("FMCSA"). (Ex. 26).

12.     Atlas Van Lines offers its Transportation and Logistics Services directly to customers and through its network of agents. (Johnson, Trial Tr. vol. II, 78:24-79:4). Plaintiffs' agents operate throughout the continental United States, including in the Detroit area, which is served by its agents J.W. Cole & Sons, DMS Moving, and Palmer Moving and Storage. (Johnson, Trial Tr. vol. II, 79:23-80:16).

13.     Atlas Van Lines primarily moves used household goods for individuals, either directly or through a corporate relocation contract. (McConnell, Trial Tr. vol. II, 97:9-20).

14.     Atlas Van Lines does not *only* move household goods, however. Atlas Van Lines also transports any kind of general commodity through one of its divisions, the Specialized Transportation Group ("Atlas's STG Division"). (McConnell, Trial Tr. vol. II, 97:21-99:12; Wahl, Trial Tr. vol. I, 33:10-19, 56:22-57:4).

15.     Atlas's STG Division has moved all kinds of general commodities since at least 1970 and continues to do so today. (Wahl, Trial Tr. vol. I, 56:22-57:4; McConnell, Trial Tr. vol. II, 101:12-24; Banks, Trial Tr. vol. II, 29:11-20; Ex. X1 at AWGI000628).

16.     In fact, Atlas's STG Division advertises that, "Atlas Van Lines, the world-class moving company, offers Specialized Transportation services totally independent from household moving."[20] (Ex. H2 at AWGI000672).

---

[20] On occasion, such as during the peak household moving season, Atlas's STG Division will also transport household goods. (Wahl, Trial Tr. vol. I, 56:6-57:4).

17.     Atlas's STG Division also provides Logistic Services for non-household goods shipments. (Wahl, Trial Tr. vol. I, 33:15-34:5; 93:19-22). In fact, if Atlas Van Lines cannot transport a load, it will broker the shipment through Atlas's STG Division. (McConnell, Trial Tr. vol. II, 99:8-12).[21]

18.     Atlas's STG Division transports non-household goods for Atlas Van Lines clients, for Atlas Van Lines' agency network, and for other Atlas World Group subsidiaries, such as Plaintiff Atlas Logistics. (Wahl, Trial Tr. vol. I, 33:15-34:5; 93:19-22).

19.     Atlas Van Lines, either owns, or has access to (through its agents or brokerage partners), trailers, trucks, dry vans, flatbed trailers, and other assets. (Wahl, Trial Tr. vol. I, 88:16-89:1; 95:9-14; McConnell, Trial Tr. vol. III, 36:10-25, 41:23-42:6).

20.     Using these assets, Atlas's STG Division can "haul anything" (McConnell, Trial Tr. vol. II, 133:2-22; Wahl, Trial Tr. vol. I, 88:16-89:1) including:

- large and heavy robotics
- goods on pallets or skids, including steel bars, steel rods, and construction material
- products for trade shows and trade show exhibits (for example, cars and motorcycles for the Detroit Auto Show)[22]
- containers and bins
- shingles
- tool and die machines

---

[21] A company that arranges Transportation Services through third parties who have access to proper assets (*e.g.*, a tractor or trailer) is commonly referred to as a "freight broker." (Wahl, Trial Tr. vol. I, 40:11-22).

[22] Some of the trade show exhibits and retail fixtures that Atlas Van Lines transports are made of steel. (Wahl, Trial Tr. vol. I, 53:20-23; 84:25-85:2). Atlas Van Lines transports trade show exhibits to McCormick Place in Chicago. (Exh. V1).

- medical equipment such as large CAT scan machines and MRI machines
- high value electronic equipment such as computer storage equipment
- hospital beds
- automobile parts
- fine art
- retail store fixtures
- space shuttle and rocket parts
- weightlifting equipment
- major league baseball team equipment
- Harley-Davidson motorcycles
- glass

21.     Some of these products require special handling or special services. Some are large, heavy machinery. (Wahl, Trial Tr. vol. I, 56:22-57:4; 61:12-21, 80:14-81:9, 84:8-24; McConnell, Trial Tr. vol. II, 97:21-99:18, 118:8-24; McConnell, Trial Tr. vol. III, 61:4-14; Wahl, Trial Tr. vol. VI, 124:3-5, 14-18, 129:15-131:19; Exhs. U1, V1, 101).

22.     Atlas's STG Division is capable of shipping steel bars and steel coils, which are general commodities. (McConnell, Trial Tr. vol. III, 33:13-14).[23] (Wahl, Trial Tr. vol. I, 88:16-89:1; 95:9-14; McConnell, Trial Tr. vol. III, 36:10-25, 41:23-42:6).

23.     In the normal course of business, Plaintiffs seek out opportunities to ship all kinds of freight, including general commodities. (McConnell, Trial Tr. vol. III, 33:13-20)

24.     If Atlas Van Lines itself cannot transport non-household goods for whatever reason (because all their assets are in use, for example), Atlas Van Lines brokers the shipment through

---

[23] Plaintiffs' bills of lading do not list steel bars or steel coils. (McConnell, Trial Tr. vol. III, 64:9-16, 39:25-40:10). That, however, does not mean that a shipment did not include steel; Plaintiffs are not required to specifically list in their bills of lading every product being transported in a shipment. (McConnell, Trial Tr. vol. III, 64:9-16, 39:25-40:10).

Plaintiff Atlas Logistics. (Wahl, Trial Tr. vol. I, 56:22-57:4; McConnell, Trial Tr. vol. III, 61:10-14, 85:8-14; McConnell, Trial Tr. vol. II, 99:8-18; Wahl, Trial Tr. vol. VI, 132:12-22).

25.    Atlas's STG Division also offers, and markets its ability to provide, "white glove service." (McConnell, Trial Tr. vol. II, 112:18-113:3). White glove service extends beyond basic shipment of goods and can include, for example, installation at the destination site, technical support, and special delivery services. (*Id.*); *see also* Exs. S2 at AWGI001108, and 135.

26.    Atlas Van Lines earns most of its revenue from transporting household goods. (Wahl, Trial Tr. vol. I, 29:8-13). In terms of quantity, however, Atlas Van Lines ships more general commodities – meaning, things other than household goods – than any other category of goods. (Wahl, Trial Tr. vol. I, 29:14-20).

27.    Moreover, Atlas's STG Division has a division called the Commercial Truckload Division ("Atlas's CTD Division"). (Wahl, Trial Tr. vol. I, 33:10-14; Ex. I2). Atlas's CTD Division is a "separate division of Atlas Van Lines, fully dedicated to truckload shipments of new products such as furniture, machinery, store and office fixtures and general commodities." (Ex. F2 at AWGI000668; Wahl, Trial Tr. vol. I, 34:6-22).

28.    Although Atlas's CTD Division does not do so regularly, it can also ship household goods and does so during peak household moving seasons. (Wahl, Trial Tr. vol. I, 61:25-62:6).

**c.    Plaintiff Atlas Logistics, Inc.**

29.    Atlas Logistics, Inc. ("Plaintiff Atlas Logistics") is an Indiana corporation with its principal place of business in Evansville, Indiana. (ECF No. 112, PageID 4049).

30.    Plaintiff Atlas Logistics was originally formed as Atlas Relocation Services, Inc. on December 11, 1995. (Ex. 31). Atlas Relocation Services, Inc. changed its name to AWG Logistics, Inc. on June 8, 2012. (Ex. 32). AWG Logistics, Inc. then changed its name to Atlas

Logistics, Inc. on January 8, 2015. (Ex. 33). Although the corporate names Atlas Relocation Services, Inc. and AWG Logistics, Inc. are no longer used, the same corporate entity has remained in existence since its formation in 1995.

31.     Like Plaintiff Atlas Van Lines, Plaintiff Atlas Logistics provides Logistics Services and has brokerage authority to do so pursuant to the FMCSA. (Wahl, Trial Tr. vol. I, 44:25-45:13; Ex. F4).

32.     Plaintiff Atlas Logistics provides Logistics Services to the general public, to Plaintiffs' network of agents, and to Plaintiffs' subsidiary companies. (Wahl, Trial Tr. vol. I, 28:14-18).

33.     Like Atlas Van Lines, Plaintiff Atlas Logistics can ship, or arrange for the shipment of, any kind of commodity, including steel. (Wahl, Trial Tr. vol. I, 29:2-7, 53:20-23, 88:16-89:1).

34.     Plaintiff Atlas Logistics arranges shipments using Plaintiffs' assets or third-party assets (either on a flatbed trailer or otherwise). (Wahl, Trial Tr. vol. I, 94:9-14; Wahl, Trial Tr. vol. VI, 132:12-22; McConnell, Trial Tr. vol. III, 41:23-42:6).

35.     In 2012, Plaintiff Atlas Logistics (then named AWG Logistics, Inc.) announced a new management structure for Plaintiffs' Logistics companies. (Ex. H1). Starting in 2012, Plaintiffs brought AWG Logistics, Atlas's STG Division, and Titan Global Distribution (Plaintiffs' other Logistics company), under one management "umbrella" to maximize operational efficiency. (Wahl, Trial Tr. vol. I, 78:8-14; Ex. H1). Neither Atlas's STG Division nor Titan Global Distribution ceased operating or changed its corporate identity under this new structure; Plaintiffs simply created a new management structure. (Wahl, Trial Tr. vol. I, 93:10-18, Wahl, Trial Tr. vol. I, 78:15-19; Wahl, Trial Tr. vol. II, 8:2-12:7). Plaintiffs continued to use ATLAS LOGISTICS to identify the umbrella structure of Logistics Services (among other things). (Ex. H1).

II.    **Plaintiffs' Use of, and Common Law Rights in, ATLAS Marks**

36.    Plaintiffs prominently and extensively use the mark ATLAS and other marks that include the word ATLAS such as:

- ATLAS VAN LINES

- ATLAS SPECIALIZED TRANSPORTATION GROUP

- ATLAS STG

- ATLAS LOGISTICS

- ATLAS FORUM

- MOVEATLAS

- ATLAS WORLD-CLASS TRAVEL

- ATLAS AMPLIFIER

- MOVING WITH ATLAS

- ATLAS WORLD GROUP

- ATLAS TERMINAL COMPANY

37.    Plaintiffs use these marks with and without designs to offer, advertise, and provide Transportation and Logistics Services.[24] (Wahl, Trial Tr. vol. I, 55:10-12; 58:19-21; 62:20-22;

---

[24] For ease of reference, the Court refers to the mark ATLAS, either alone or with another term, and either as a word or with a design, as the "ATLAS Brand."

69:3-5; 85:25-86:1; 87:7-9; Johnson, Trial Tr. vol. II, 42:9-11, 43:24-44:11, 44:19-25; Exs. H2, I2, F2, J2, M2, K2, TI, U1, V1, W1, W5, E1, X1, Z1, L2, and S2).

38.     Plaintiffs also use ATLAS as part of the following logo. (Ex. U).



39.     The word ATLAS is much larger than LOGISTICS because Plaintiffs want to make sure people notice and focus on the ATLAS part of the mark. (Johnson, Trial Tr. vol. II, 47:24-48:13). ("Atlas is the key, that we want to make sure that everybody really notices. . . So that's really what we want people to focus on. . . That's what we want to draw people's eye to.")

40.     The ATLAS Brand is extraordinarily important to Plaintiffs. Plaintiffs offer all of their services, including Transportation and Logistics Services, under the ATLAS Brand. As Plaintiffs' executives testified, Plaintiffs are known in the industry and around the world by the ATLAS Brand–in their words "it's who we are." (Wahl, Trial Tr. vol. II, 8:2-13; Johnson, Trial Tr. vol. II, 39:4-7).

41.     Since at least as early as 1948–over 70 years ago–and continuously since then, Atlas Van Lines has prominently and extensively used in commerce the ATLAS Brand to offer Transportation Services, including transportation of household and non-household goods. (Johnson, Trial Tr. vol. II, 43:18-23; McConnell, Trial Tr. vol. III, 82:1-8; Exhs. H2, I2, F2, J2, M2, K2, TI, U1, V1, W1, W5, E1, X1, Z1, L2, and S2).

42.     Since at least as early as 1972–nearly 50 years ago–and continuously since then, Plaintiffs have used the ATLAS Brand to offer Logistics Services, both for household goods and commercial shipments. (Wahl, Trial Tr. vol. I, 50:24-51:1, 69:18-70:6, 74:1-3, 78:15-19; Wahl, Trial Tr. vol. II, 10:17-21; Banks, Trial Tr. vol. II, 29:3-20; Johnson, Trial Tr. vol. II, 45:5-9;

McConnell, Trial Tr. vol. II, 110:4-23, McConnell, Trial Tr. vol. III, 82:9-15; Exs. H2, I2, F2, J2, M2, K2, TI, U1, V1, W1, W5, E1, X1, Z1, L2, and S2).

43.     The ATLAS Brand includes ATLAS followed by one or more generic and/or descriptive terms, such as "van lines" (ATLAS VAN LINES), "specialized transportation group" (ATLAS SPECIALIZED TRANSPORTATION and ATLAS SPECIALIZED TRANSPORTATION GROUP) and "logistics" (ATLAS LOGISTICS). (Wahl, Trial Tr. vol. I, 74:1-3; Johnson, Trial Tr. vol. II, 42:15-17, 45:24-46:11; Ex. U1).

44.     The addition of these generic and/or descriptive terms adds "very little" brand value and does not change the meaning or commercial impression of the mark. (Johnson, Trial Tr. vol. II, 42:18-43:5, 46:2-46:11; McConnell, Trial Tr. vol. II, 103:7-11).

45.     From a marketing perspective, ATLAS is the same as ATLAS VAN LINES, and ATLAS LOGISTICS, when used to offer Transportation and Logistics Services, and Plaintiffs use the marks interchangeably. (Johnson, Trial Tr. vol. II, 42:15-43:8, 45:24-45:11; McConnell, Trial Tr. vol. II, 101:25-102:5). Indeed, Atlas Van Lines has been slowly phasing out use of VAN LINES and has focused on ATLAS, where it believes the brand equity lies. (McConnell, Trial Tr. vol. III, 63:18-24).

46.     Plaintiffs and others refer to Plaintiffs as just ATLAS. (Johnson, Trial Tr. vol. II, 43:6-8, 43:18-46:1). For example, on Plaintiffs' website, Plaintiffs advertise:

● "**Atlas**® services lead the industry." (Ex. S2 at AWGI001106)

● "With **Atlas**, there are several ways to begin your move." (Ex. S2 at AWGI001093).

● "**Atlas**® moving companies provide full moving services and logistics." (*Id*.)

47.     In fact, when the mark ATLAS is used within the transportation and logistics industry, it usually refers to Plaintiffs. (McConnell, Trial Tr. vol. III, 28:11-18).

48.     Plaintiffs are not the only ones to shorten their company names to a nickname that eliminates the generic and/or descriptive components. (Johnson, Trial Tr. vol. II, 43:10-17). Similar to how Plaintiffs nickname ATLAS refers to ATLAS VAN LINES and ATLAS LOGISTICS: ALLIED VAN LINES also markets itself as ALLIED; UNITED VAN LINES also markets itself as UNITED; MAYFLOWER VAN LINES markets itself as MAYFLOWER; BEACON'S VAN LINES markets itself as BEACON'S; and NORTH AMERICAN VAN LINES markets itself as NORTH AMERICAN. (*Id.*; McConnell, Trial Tr. vol. II, 102:23-103:11).

49.     Plaintiffs began using the generic term "logistics" after ATLAS in approximately 2007 and have used ATLAS LOGISTICS continuously since then. (Wahl, Trial Tr. vol. I, 70:7-25; Johnson, Trial Tr. vol. II, 47:4-14; McConnell, Trial Tr. vol. II, 144:4-7; T1). Plaintiffs did so because at the time, the word "logistics" was emerging as a buzzword in the industry and Plaintiffs needed to keep up with the marketplace's advertising and marketing style. (Johnson, Trial Tr. vol. II, 47:4-14; Wahl, Trial Tr. vol. I, 70:7-25).

50.     From a marketing and advertising perspective, Plaintiffs consider ATLAS and ATLAS LOGISTICS to be the same mark. (Wahl, Trial Tr. vol. I, 70:21-71:3; Johnson, Trial Tr. vol. II, 46:2-6).

51.     After Plaintiffs began using ATLAS LOGISTICS in 2007, they continued to do so, despite corporate name changes in 2012 and 2015. (Wahl, Trial Tr. vol. I, 78:15-19; 102:20-103:8; Wahl, Trial Tr. vol. II, 11:8-19; McConnell, Trial Tr. vol. II, 128:7-23).

52.     Since 2006, Plaintiffs, including their related companies that also use the ATLAS Brand, have earned $11 billion in revenue from providing Transportation and Logistics Services under the ATLAS Brand. (Banks, Trial Tr. vol. II, 27:6-18).

53.     Since 2006, Plaintiffs, including their related companies that also use the ATLAS Brand, have spent over $32 million, including $2 million in 2019 alone, on marketing and advertising the ATLAS Brand for Transportation and Logistics Services. (Banks, Trial Tr. vol. II, 28:6-17; Johnson, Trial Tr. vol. II, 39:13-24).

54.     Plaintiffs use various marketing channels to promote the ATLAS Brand for Transportation and Logistics Services. For example, Plaintiffs and their agents display the ATLAS Brand on each of their roughly 3,300 over-the-road trailers. (Johnson, Trial Tr. vol. II, 76:6-10; 79:13-16; McConnell, Trial Tr. vol. III, 68:20-69:1; Ex. S2 at AWGI001093).

55.     Plaintiffs prominently use the ATLAS Brand to promote their Transportation and Logistics Services on all brochures, magazines, press releases, pamphlets, and other printed marketing collateral.[25] (Johnson, Trial Tr. vol. II, 58:1-7, 61:18-25; Exs. I2, F2, J2, Z1, K2, W1, and U1). For example (emphasis added):

- "When it's time to transport sensitive electronic equipment, count on **Atlas** to handle it safely, efficiently." (Ex. U1).

- "Go with a full-service, experienced, responsive team. Go with the strength of a global 3PL network and a padded-van fleet. Go with confidence in the stable and respected **Atlas World Group** brand…since 1948." (Ex. U).

- "In a typical **Atlas** day, while helping thousands of people move, we run across just about everything one can imagine." (Ex. E1, at AWGI0000352)

---

[25] Plaintiffs generally do not advertise its general commodity business through marketing materials. The fact that Plaintiffs do not have such material directed to a particular commodity, however, does not mean it is not able to ship that commodity. (McConnell, Trial Tr. vol. III, 72:17-22).

- "At **Atlas**, we bring a commitment of integrity, quality and solutions to everything we do." "**Atlas Logistics** bring together the finest people, systems, and equipment to respond to any transportation need, anywhere in the world. Our diverse network of qualified carriers and our experienced management staff make it possible for Atlas Logistics to manage all your transportation needs. Regardless of the product or equipment that must be moved, Atlas Logistics has access to the resources that will effectively and efficiently manage your transportation needs." (Ex. T1).

- "With **Atlas**, no detail is too small. We take care of it all." (Ex. V1).

- "**Atlas** can help with complete logistics planning, to save you time and expense. Through affiliates in the fine arts community we also offer consolidation and dispersal; specialized crating, packing and installation; and nationwide climate-controlled storage. And, of course, courier services are always welcome." (Ex. W1, AWGI000604).

- "**Atlas** takes the worry out of truckload transportation." (Ex. F2 at AWGI000668).

- "This is the boy…who visits the museum to see the creatures…brought to life by the exhibit professionals…using a logistics solution that **Atlas** built." (Ex. K2 at AWGI000681). "With a network of agents and service partners spanning the U.S., Canada and overseas, **Atlas** encompasses a host of solutions for transporting people, products and lifestyles." (*Id.* at AWGI000683). "Despite broad capabilities, those who share the **Atlas** identity acknowledge the importance of one characteristic strength in particular: the ability to please customers." (*Id.*)

- "**Atlas** Moving Companies Provide Full Moving Services and Logistics" (Ex. S2 at AWGI001096).

- "When you need logistics answers, including trucking, warehousing and consulting, **Atlas Logistics**™ puts it all together so you are good to go." (*Id.* at AWGI001108). "Your **Atlas Logistics** team is ready to help." (*Id.*)

56.     Plaintiffs also prominently feature the ATLAS Brand on their websites, including

www.atlasworldgroupinc.com,          www.atlasvanlines.com,          www.atlasterminal.com,

www.atlasworldclasstravel.com, and www.atlaslogistics.com. (Johnson, Trial Tr. vol. II, 48:20-49:17; ECF No. 112, PageID 4048).

57.     These websites include links to other websites owned and operated by Plaintiffs that also prominently use the ATLAS Brand to advertise Transportation and Logistics Services; for example, the Atlas Van Lines website links to www.atlasworldgroupinc.com and www.atlaslogistics.com. (Johnson, Trial Tr. vol. II, 48:20-49:5, 50:17-23; 52:13-15; Ex. S2 at AWGI001096, S2 at AWGI001108).

58.     Plaintiffs launched the www.atlaslogistics.com website in October 2014, shortly after they acquired the domain name. (Wahl, Trial Tr. vol. I, 102:8-12; I1 at AWGI0000378). Even before the acquisition, however, Plaintiffs used the ATLAS LOGISTICS mark to advertise its Logistics Services on the Atlas Van Lines website at www.atlasvanlines.com/logistics. (McConnell, Trial Tr. vol. II, 122:10-25, McConnell, Trial Tr. vol. III, 70:14-71:3; Ex. H1 (web address located in lower left corner), S2 at AWGI001108). Both www.atlaslogistics.com and www.atlasvanlines.com/logistics continue to use the ATLAS LOGISTICS mark to offer Logistics Services through the present day.

59.     Customers can request a quote for Transportation and Logistics Services from the www.atlasvanlines.com website by clicking the GET A QUOTE or GET A MOVING QUOTE buttons on the homepage, and on www.atlaslogistics.com website by clicking GET A QUOTE on the homepage. (Ex. S2 at AWGI001093)

60.     In 2019, the www.atlasvanlines.com website was visited nearly 6 million times and www.atlaslogistics.com was visited about 150,000 times. (Johnson, Trial Tr. vol. II, 53:7-13).

38

61.     Plaintiffs also pay for advertising featuring the ATLAS Brand for Transportation and Logistics Services, resulting in millions of commercial impressions on Plaintiffs' websites and a large percentage of Plaintiffs' business leads. (Johnson, Trial Tr. vol. II, 54:1-16).

62.     Plaintiffs advertise the ATLAS Brand on social media, including Facebook, LinkedIn, Twitter, Instagram, and Pinterest. (Johnson, Trial Tr. vol. II, 54:24-55:6). The ATLAS Brand is used every time a post is made. (*Id*. at 55:15-21).

63.     The Atlas Van Lines Facebook page has around four million total impressions. (Johnson, Trial Tr. vol. II, 56:15-17). The Atlas Logistics Facebook page has around 40,000 total impressions. (Johnson, Trial Tr. vol. II, 55:24-56:14).

64.     Atlas Van Lines also maintains a YouTube channel for informational videos about Plaintiffs, and to provide helpful hints, tips, and things of that nature for the consumer. (Johnson, Trial Tr. vol. II, 57:12-25). Since 2015, these videos have been viewed about 300,000 times. (*Id*.)

65.     Plaintiffs expand their reach of the ATLAS Brand by licensing the ATLAS Brand to their nationwide network of agents, who serve as representatives of the ATLAS Brand. Plaintiffs provide marketing support to these agents by providing website development, creating brochures, preparing presentations, and "anything that they need [Plaintiffs'] assistance with." (Johnson, Trial Tr. vol. II, 78:24-79:16, 37:20-25). The ATLAS brand is displayed on every one of the agents' websites. (Johnson, Trial Tr. vol. II, 80:1-2; Ex. U5).

66.     Plaintiff Atlas Logistics also offers its Transportation and Logistics Services and advertises its ATLAS brand through salespeople. (Wahl, Trial Tr. vol. II, 15:24-16:5).

67.     Plaintiff Atlas Logistics also offers its Services on load boards. (McConnell, Trial Tr. vol. III, 36:21-25). A load board is a platform where carriers and shippers can post availability of a truck or a load that needs to be transported. (Bronson, Trial Tr. vol. V, 92:4-18).

68.     Finally, Plaintiffs advertise their Transportation and Logistics Services at tradeshows for both the transportation industry and the logistics industry. (Johnson, Trial Tr. vol. II, 76:11-77:7). Plaintiffs attend trade shows for both industries, along with other competitors such as North American Van Lines, Mayflower Van Lines, and United Van Lines. (*Id.*)

## III.     Plaintiffs' ATLAS Trademark Registrations

69.     Plaintiffs own the following trademark registrations (among others):

- ATLAS - Reg. No. 3,718,117 for "freight forwarding services and transportation of household goods of others" (Ex. P; ECF No. 112, PageID 4046).

-  - Reg. No. 3,137,526 for "clothing, namely hats and shirts, and cloth patches for clothing" (Ex. J; ECF No. 112, PageID 4046).

- ATLAS THE AGENTS' VAN LINE - Reg. No. 1,591,344 for "transportation of household goods by motor van" (Ex. C; PageID 4046).

- ATLAS LOGISTICS - Reg. No. 4,737,616 for "business management consultancy in the field of transport and delivery; providing electronic tracking of freight information to others for business administration purposes; providing tracking services and delivery containers for business inventory purposes; transportation logistics services, namely, arranging the transportation of goods for others," and "installation of restaurant equipment, namely, tables, chairs, booths and shelving; installation of healthcare facility furniture and equipment, namely, hospital beds, overhead tables, lockers, office furniture; installation of shelving and fine arts;" and "distribution services, namely, delivery of restaurant equipment, namely, tables, chairs, booths and shelving; distribution services, namely, delivery of healthcare facility furniture and equipment, namely, hospital beds, overhead tables, lockers, office furniture and shelving; distribution services, namely, delivery of fine arts; transport of general commodities and special products by truck and/or motor van, train, air and ocean; transportation and storage of goods; warehousing information; warehousing services;" and "assembly of office and industrial furniture, shelving and equipment for others" (Ex. S; ECF No. 112, PageID 4046-4047).

70. Plaintiffs' registrations for ATLAS, the flying A, and ATLAS THE AGENTS' VAN LINE are incontestable pursuant to 15 U.S.C. § 1065 (ECF No. 112, PageID 4049-4050).

71. Plaintiffs use the registration symbol (®) next to ATLAS, whether used alone or in combination with other terms, to signify to the marketplace that ATLAS is the important name – "that is our brand." (Johnson, Trial Tr. vol. II, 68:16-20). For example, Plaintiffs' website states, "Atlas® services lead the industry." (S2 at AWGI001106) and "Atlas® moving companies provide full moving services and logistics." (*Id*. at AWGI001093).

72. Defendants do not challenge Plaintiffs' ownership of the ATLAS mark alone. (ECF No. 112, PageID 4050)

## IV. The Defendants

73. Defendants Eaton Steel Bar Company, Atlas Trucking Company, LLC, and Atlas Logistics, LLC (collectively, "Defendants") are affiliated companies that provide Transportation and Logistics Services.

74. Defendants are "expanding what [they] do." (Bronson, Trial Tr. vol. VI, 40:5-8). For example, although Defendant may not have previously arranged for a certain type of shipment, it would do so "if somebody needed to and it [was] a money-making opportunity." (Bronson, Trial Tr. vol. V, 118:4-12).

### a. Defendant Eaton Steel Bar Company

75. Eaton Steel Bar Company ("Eaton Steel") is a Michigan corporation with its principal place of business in Oak Park, Michigan.

76. Eaton Steel, itself or through its subsidiaries, manufactures and distributes steel. (Goodman, Trial Tr. vol. V, 30:7-15).

41

77.     Eaton Steel promotes the transportation and logistics services offered by Atlas Trucking Company, Inc. and Atlas Logistics, LLC on its website, www.eatonsteel.com. For example, Eaton Steel's homepage states: "Our Atlas Trucking and Logistics company is designed to deliver your products on time, every time."

**b.     Defendant Atlas Trucking Company, LLC**

78.     Atlas Trucking Company, LLC ("Atlas Trucking") is a Michigan limited liability company, with its principal place of business in Taylor, Michigan.

79.     Atlas Trucking has motor carrier brokerage authority pursuant to the FMCSA. (Ex. 27). (This is the same authority granted to Atlas Van Lines and Plaintiff Atlas Logistics.) (Wahl, Trial Tr. vol. I, 48:12-15).

80.     Atlas Trucking was originally created to ensure a reliable and timely delivery source for Eaton Steel's products, namely, steel and metal. (Goodman, Trial Tr. vol. V, 34:17-35:15). Over time, however, Atlas Trucking came to ship goods other than steel and metal, and for companies in addition to Eaton Steel. (Goodman, Trial Tr. vol. V, 54:22-55:1).

81.     Defendants will haul anything, nationwide, so long as Defendants' insurance and authority permit and Defendants are "comfortable hauling it safely and securely." (Bronson, Trial Tr. vol. VI, 40:11-15; Goodman, Trial Tr. vol. V, 45:20-22). For example, Atlas Trucking ships "a bunch of stuff" including:

- Furniture
- Large and heavy robotics

- Trade show products[26]
- Auto parts
- Pallets and skids
- Containers and bins
- Shingles
- Sod
- Trees
- Lumber
- Wood
- Electrical control panels
- Glass beads

(Goodman, Trial Tr. vol. V, 62:19-24; Bronson, Trial Tr. vol. V, 94:15-16, 95:16-25, 96:4-97:1, 109:22-25; 129:13-17; Trial Tr. vol. VI, 49:24-25; Exs. 101, F6, G6, H6, and I6).

82.      The foregoing list is a "very small fraction" of commodities shipped by Defendants. (Bronson, Trial Tr. vol. VI, 17:10-12). In fact, Defendants ship "dozens of categories of commodities unrelated to steel that result in hundreds of shipments [for] customers other than [Defendants]." (Bronson, Trial Tr. vol. VI, 20:6-15).

83.      While Defendants typically ship these goods on flatbeds, many goods that Defendants ship on flatbeds can also be shipped in enclosed trailers. (Bronson, Trial Tr. vol. VI, 7:21-8:19).

---

[26] Like Plaintiffs (Ex. V1), Defendants ship products to trade shows, including to McCormick Place Convention Center in Chicago, IL. (Bronson, Trial Tr. vol. V, 95:6-15; Bronson, Trial Tr. vol. VI, 10:2-3).

84.     Defendants can also ship goods that have been preloaded into a Conex (also known as a "sea container" or an "intermodal container") on a flatbed trailer. (Bronson, Trial Tr. vol. VI, 42:5-16).

85.     Atlas Trucking ships some of these goods on its "backhauls," meaning the inbound route back to Metro Detroit from every outbound shipment. (Goodman, Trial Tr. vol. V, 62:19-24; Bronson, Trial Tr. vol. V, 97:20-23). Atlas Trucking and their drivers want the trucks to be full on their way back to Metro Detroit so as not to lose money. (Bronson, Trial Tr. vol. V, 97:24-98:21). Indeed, if a truck driver had to return with an empty truck more than a few times, "he would quit." (Bronson, Trial Tr. vol. V, 98:8-21).

86.     The only factors Atlas Trucking considers in whether to accept a load are: whether the load fits the type of trailer attached to the tractor; whether insurance would cover transportation of the load; whether the goods can be safely shipped in the trailer; and whether shipping the load would exceed Atlas Trucking's authority under its FMCSA license.[27] (Bronson, Trial Tr. vol. V, 103:17-105:1).

87.     If Atlas Trucking itself cannot accept a load, however, it will not reject the shipment. Instead, Atlas Trucking will try to broker the load through Defendant Atlas Logistics. (Bronson, Trial Tr. vol. VI, 43:19-21, 44:15-24; Bronson, Trial Tr. vol. V, 125:20-126:9).

88.     Atlas Trucking owns three dry vans, and approximately 79 flatbeds. (Bronson, Trial Tr. vol. V, 65:16-21; Exs. 101, V4). Approximately 42 of the 79 flatbeds have Conestoga covers. (Bronson, Trial Tr. vol. V, 79:6-80:12; Exhs. T4, U4).

---

[27] Hazardous materials are the only type of load precluded from Defendants' insurance policy. (Bronson, Trial Tr. vol. VI, 41:2-15)

89.    When a Conestoga cover is deployed over a flatbed, it is not possible to see what is on the flatbed. (Bronson, Trial Tr. vol. VI, 9:9-13). Therefore, it would not be possible to determine, from an exterior visual examination, whether a trailer with a Conestoga cover was hauling, for example, shingles, steel, or pallets. (*Id.*)

90.    Atlas Trucking ships goods throughout the United States, as well as to and from Canada. *See* www.atlastrucking.com/employment/owner-operator ("Atlas Trucking delivers "shipments promptly and safely to locations across the continental United States and parts of Canada"; https://www.atlastrucking.com/services/trucking-services ("We operate in the contiguous 48 states but use our network of trusted carriers and Atlas Logistics to transport and manage freight wherever you need to send it"; https://www.atlastrucking.com/services/logistics-services ("A partner to Atlas Trucking Company, Atlas Logistics, based in Michigan, is a licensed broker for common and contract carrier freight in the U.S. and Canada. We provide third party logistics as well as logistics services for Atlas Trucking Company." and "Atlas Logistics has procured under carrier agreements, resulting in an asset carrier base that is in the thousands over the contiguous 48 States and Canada.")[28]

91.    Atlas Trucking offers, and advertises their ability to provide, white glove service, meaning providing services for commodities that need to be "delicately handled". (Bronson, Trial Tr. vol. VI, 39:18-40).

---

[28] The Court takes judicial notice of these statements made on Defendants' website pursuant to Fed. R. Evid. 201(c)(1).

c.      **Defendant Atlas Logistics, LLC**

92.      Atlas Logistics, LLC ("Defendant Atlas Logistics") is a Michigan limited liability company, with its principal place of business in Taylor, Michigan. (ECF No. 27, PageID 226).

93.      Defendant Atlas Logistics was formed in 2003 as an "adjunct" to Atlas Trucking. (Goodman, Trial Tr. vol. V, 59:17-23; Gunsberg, Trial Tr. vol. VI, 75:15-17). Specifically, Defendant Atlas Logistics was formed, and operates today, to find carriers to handle loads – inbound or outbound – that Atlas Trucking Company cannot or will not handle. (Goodman, Trial Tr. vol. V, 46:19-47:5; ECF No. 112, PageID 4049).

94.      Defendant Atlas Logistics received its FMCSA motor carrier brokerage authority on January 26, 2005. (Ex. G4). This is the same authority granted to Plaintiffs Atlas Van Lines and Atlas Logistics. (Wahl, Trial Tr. vol. I, 48:12-15; Exs. 26 and F4).

95.      Defendants have employees in common; for example, Mr. Jeffery Bronson serves as the Senior Director of Transportation for both Atlas Trucking and Defendant Atlas Logistics. (Bronson, Trial Tr. vol. V, 64:3-12).

96.      In addition, Defendants' employees sit on the same floor "within shouting distance" of one another. (Bronson, Trial Tr. vol. V, 112:14-23).

97.      Atlas Trucking and Defendant Atlas Logistics's customers include Echo Global Logistics, Inc., Coyote Logistics, Land Star, CH Robinson Worldwide Inc., Tata Steel, and Penske. (Exhs. I6, 71).[29] Defendants evidence focused on their "top 25" customers, but in fact, they have

---

[29] Defendants' highlighting on Exhibit 71 indicates those companies that became customers of Defendants after Mr. Bronson took his current position as Senior Director of Transportation with Atlas Logistics, LLC and Atlas Trucking LLC in March, 2014. (Bronson, Trial Tr. vol. VI, 27:5-9; Bronson, Trial Tr. vol. V, 64:3-12). Defendants offered no evidence as to how long the

over 12,000 customers. (Ex. 71). None of Defendants' customers has entered into an exclusivity agreement with Defendants. (Bronson, Trial Tr. vol. VI, 28:12-19).

98.     Plaintiffs and Defendants have over 50 customers in common, including some listed on Defendants' top 25 list. (Wahl, Trial Tr. vol. VI, 126:23-128:2).

## V.     Defendants' Use of ATLAS

99.     Defendants use the following marks, all of which include the word ATLAS:

● ATLAS

● ATLAS TRUCKING

● ATLAS TRUCKING COMPANY (and ATLAS TRUCKING COMPANY, LLC)

● ATLAS LOGISTICS (and ATLAS LOGISTICS, LLC)

● 

● 

100.     Defendants use these marks (collectively referred to as "Defendants' Marks") to offer Transportation and Logistics Services. (Ex. K6).

---

companies that are not highlighted had been customers before Mr. Bronson employment, nor on the extent or depth of those relationship.

101.    Defendants added the term "trucking" to ATLAS because Atlas Trucking is "in the trucking industry, or the trucking business." (Goodman, Trial Tr. vol. V, 41:12-15).

102.    Defendants named their logistics company and chose the brand ATLAS LOGISTICS because "it seemed like a natural name" and "Atlas Logistics was an add-on to Atlas Trucking." (Goodman, Trial Tr. vol. V, 47:6-8, 55:9-14).

103.    At the time Defendants decided to brand their company ATLAS LOGISTICS, Defendants were aware of Atlas Van Lines. (Goodman, Trial Tr. vol. V, 56:19-23).

104.    Defendants believe that ATLAS is the "most important" part of ATLAS TRUCKING and ATLAS LOGISTICS. (Bronson, Trial Tr. vol. VI, 39:5-13).

105.    In fact, Atlas Trucking and Defendant Atlas Logistics are often referred to as simply "ATLAS." (Goodman, Trial Tr. vol. V, 58:3-8; Bronson, Trial Tr. vol. V, 122:25-123:3, 123:11-17; 154:15-17). For example, Defendants' website states that:

- **Atlas** supports its drivers on and off the job with best in-class technology and great perks. (Ex. K6, p. 2).

- When you ship with **Atlas**, you leave worry behind. (Ex. K6, p. 2).

- "Partner with Atlas and never look for another load again (Ex. K6, p. 2).

106.    Defendants use ATLAS in the following design mark in offering Transportation and Logistics Services:



(Ex. K6).

107.    When people orally refer to Atlas Trucking or Defendant Atlas Logistics, however, they do not refer to the logo. (Goodman, Trial Tr. vol. V, 57:23-58:4; Bronson, Trial Tr. vol. V, 154:15-17).

108.    Defendants offer their Transportation and Logistics services through salespeople. (Bronson, Trial Tr. vol. V, 92:19-93:20, 121:22-122:3; Bronson, Trial Tr. vol. VI, 36:7-15).

109.    Defendants also offer their Transportation and Logistics Services on load boards, where they display the ATLAS TRUCKING word mark. When doing so, Defendants do not restrict the goods they will accept; Defendants merely look for customers who have products that could be shipped on a flatbed. (Bronson, Trial Tr. vol. V, 92:25-93:20, 92:19-20, 121:22-122:3; Bronson, Trial Tr. vol. VI, 36:7-9).

110.    Defendants also use ATLAS to promote Transportation and Logistics Services on marketing handouts. (Bronson, Trial Tr. vol. V, 122:6-9, 22-24).

111.    Defendants maintain a website, www.atlastrucking.com to advertise and promote their Transportation and Logistics Services. (Bronson, Trial Tr. vol. VI, 35:25-36:3; Exs. K6, L6, 101). Customers can request a quote by clicking the REQUEST A QUOTE box on Defendants' homepage. (Ex. K6).

112.    Defendants solicit shipments of any goods, without limiting their advertising about what they will ship "in any way, shape, or form." (Bronson, Trial Tr. vol. VI, 23:1-5). Indeed, Defendants' website states, "No matter what you're shipping, trust us to get it there." (Ex. K6).

113.    In addition, Defendants' website states, "At Atlas Trucking Company, we haul it all, and we depend on our team of well qualified company drivers and owner operators to deliver freight shipments promptly and safely to locations across the continental United States and parts of Canada." (Bronson, Trial Tr. vol. VI, 24:5-11; Ex. L6).

114.    At one time, Defendants' website advertised that "[f]rom coast to coast, from soft drinks to steel … we haul it all." (Ex. F3).

115.    Defendants are "broadcasting a broad net to get the phone to ring." Because even if "[Defendants] don't haul it on the Atlas Trucking side," Defendants "could move it on the Atlas Logistics side with partner carriers." (Bronson, Trial Tr. vol. VI, 22:20-23, 24:7-16; Bronson, Trial Tr. vol. V, 125:4-126:9).

116.    Defendants' website does not have any language (for example, a disclaimer) saying that Defendants haul only on flatbeds, or subject to DOT authority, or subject to insurance restrictions, because Defendants "don't want to put any negatives on [their] website." (Bronson, Trial Tr. vol. V, 125:12-19).

117.    The ATLAS mark is prominently displayed on Defendants' trailers (including dry vans). (McConnell, Trial Tr. vol. III, 67:6-20, 68:4-69:1, 69:24-70:8; Ex. X4, V4, Y4).

118.    Defendants advertise the ATLAS mark on social media, including Facebook, Twitter, Instagram, and LinkedIn. (Bronson, Trial Tr. vol. VI, 36:16-20).

119.    Defendants contend they first used ATLAS LOGISTICS on September 16, 2005, on an invoice that includes the following ATLAS LOGISTICS and Design Logo, and then again on September 23, 2005, on another invoice that includes the same Logo. (Exs. H4, I4, and 137).



120.    Defendants stipulated that, "[a]t the time Defendants first used 'Atlas Logistics' they had not conducted any investigation to determine whether 'Atlas Logistics' was available as a trademark." (ECF No. 112, PageID 4049).

121.    Moreover, in interrogatory answers dated October 18, 2017, Defendants stated that they did not conduct any investigation or perform any trademark search before they began using ATLAS or ATLAS LOGISTICS to determine whether ATLAS or ATLAS LOGISTICS was available to use as a trademark. (Gunsberg, Trial Tr. vol. VI, 86:24-87:9, 109:11-110:13).

122.    Defendants co-founder Mark Goodman nevertheless testified that "we felt okay to use the name" in 2003 because they had retained a tax attorney to search the LARA database, and found that "there was no Atlas Logistics" in the database. (Goodman, Trial Tr. vol. V, 47:11-19, 55:15-56:10).[30] He also testified, however, that neither he nor anyone under his direction ever investigated whether Atlas or Atlas Logistics was available as a trademark at the time Defendants began using those marks. (Gunsberg, Trial Tr. vol. VI, 115:16-19).

123.    In January 2012, Defendants searched for the word ATLAS on the records of the U.S. Patent & Trademark Office using its Trademark Electronic Search System ("TESS") search engine. TESS "allows you to search the USPTO's database of registered trademarks and prior pending applications to find marks that may prevent registration due to a likelihood of confusion refusal." (http://tmsearch.uspto.gov/bin/gate.exe?f=tess&state=4801:hghak4.1.1). The search identified 481 trademark applications and registrations. (Gunsberg, Trial Tr. vol. VI, 58:22-59:14). Defendants did not offer any evidence on the status of the applications or registrations; meaning, whether they were then in force ("alive") or no longer active ("dead").

124.    Defendants searched the TESS database again in August 2019. They searched for all applications or registrations, whether live or dead, for marks that include ATLAS. The search

---

[30] The State of Michigan's LARA database is accessible on the Michigan Department of Licensing and Regulatory Affairs' website. *See* https://www.michigan.gov/lara/0,4601,7-154-89334_61343_35413---,00.html.

retrieved 2,130 applications and registrations, including, for example: A KID'S ATLAS FOR LIVING; SKINNY ATLAS LIGHT; and THE DARTMOUTH ATLAS OF HEALTH CARE (Ex. 85, nos. 113, 355, 1410; Gunsberg, Trial Tr. vol. VI, 60:9-20).

125.    Defendants filtered the list to remove applications, leaving 1,258 registrations. But that list still included dead registrations. (Gunsberg, Trial Tr. vol. VI, 61:1-19; Ex. 86).

126.    None of Defendants' TESS searches were limited to the transportation area; "they're 'Atlas' for anything.'" (Gunsberg, Trial Tr. vol. VI, 62:15-63:4).

127.    Defendants also searched SAFER, which is the Department of Transportation's "Safety and Fitness Electronic Records (SAFER) System [that] offers company safety data and related services to industry and the public over the Internet." (https://safer.fmcsa.dot.gov/). They searched "SAFER government site to see how many companies are listed by Atlas, and then how many would fit into various names or identifications that would relate to transportation." (Gunsberg, Trial Tr. vol. VI, 63:5-15).

128.    Defendants did not introduce evidence on when they searched SAFER but the results identified 600 companies as "Atlas something." (Gunsberg, Trial Tr. vol. VI, 63:24-64:13).

129.    Defendants ran a search on SAFER at trial, on January 29, 2020. They searched for the word ATLAS and came up with 500 "companies that have authority to transport. … Some of them are dead, some of them are discontinued." (Gunsberg, Trial Tr. vol. VI, 67:18-68:20).

130.    The searches that Defendants ran in 2012 and 2019 "[gave Defendants] comfort in [their] position of non-infringement of the Atlas trademark" because "the claim that [Plaintiffs] had a strong mark in the transportation field seemed to be contradicted by what we found." (Gunsberg, Trial Tr. vol. VI, 70:6-17, 62:23-63:4, 50:4-6, 91:10-12; Goodman, Trial Tr. vol. V, 47:11-19).

131.    Defendants have not filed any federal or state trademark applications to register any mark that includes ATLAS and do not own any federal trademark registrations or pending federal trademark applications for any mark that includes ATLAS. (ECF No. 112, PageID 4049).

## VI.    Evidence of Confusion

132.    In 2016, a truck driver contacted Plaintiffs' recruiting team about potential employment. Plaintiffs' recruiting team instructed the driver to complete an online application. When Plaintiffs did not hear back from the driver, the recruiting team contacted the driver to follow-up. The truck driver said that he had filled out the application. After confirming that Plaintiffs had not received his application, the driver discovered he had mistakenly filled out an application for Atlas Trucking, one of the Defendants. (McConnell, Trial Tr. vol. II, 120:3-23).

133.    Defendants monitored their calls for instances of confusion for one year, from August 2017 to August 2018. (Bronson, Trial Tr. vol. V, 113:6-15, 114:4-11). Despite knowing this lawsuit was pending, Atlas Trucking stopped monitoring its calls for confusion after one year because it "saw no point in going forward." (Bronson, Trial Tr. vol. VI, 6:20-7:5; Gunsberg, Trial Tr. vol. VI, 72:18-24). Defendants did not maintain any records of additional confused callers after August, 2018. (*Id*.)

134.    During the time Defendants were monitoring their calls, four people called Defendant Atlas Trucking looking for Plaintiff Atlas Van Lines: two people were looking for household moving services; one person was a police officer who thought that a truck belonged to Defendant Atlas Trucking when it actually belonged to Plaintiff Atlas Van Lines; and one person called Defendant Atlas Trucking to complain about dangerous driving when the truck driver was actually driving one of Plaintiff Atlas Van Lines's trucks. (Bronson, Trial Tr. vol. V, 115:21-116:18, 148:16-149:20, 151:19-154:6, 154:22-156:7; Exs. F5, G5, K5, L5).

135.    Plaintiffs' counsel commissioned Ms. Krista Holt, a Managing Director at Econ One Research, Inc., a national research and consulting firm. Ms. Holt has provided consulting services, including surveys and expert testimony, for over 15 years in more than 175 Lanham Act and other intellectual property cases. (Holt, Trial Tr. vol. III, 89:7-8, 90:23-24; Ex. X5).

136.    Ms. Holt ran an online survey on the confusion, if any, resulting from Plaintiffs' use of ATLAS within ATLAS LOGISTICS and Defendants' use of ATLAS within ATLAS TRUCKING AND LOGISTICS. (Holt, Trial Tr. vol. III, 117:6-15, 130:5-20, 89:7-8, 90:23-24).[31]

137.    Ms. Holt targeted past or prospective customers of freight transportation or for-hire trucking services who have either hired, or expect to hire, a business or organization to provide freight transportation or for-hire trucking services. (Holt, Trial Tr. vol. III, 129:4-13).

138.    Qualified survey respondents were divided into a test cell (120 respondents) and a control cell (110 respondents). The respondents in the test cell were shown the results page of an Internet search using "atlas logistics" as the search term. The results page included listings for Plaintiffs' Atlas Logistics and Defendants' Atlas Trucking & Logistics. Twenty one percent of the respondents in the test cell believed that Plaintiff Atlas Logistics' website and Defendant Atlas Trucking & Logistics' website are from the same company or have a business affiliation or a business connection with each other. (Holt, Trial Tr. vol. III, 113:17-114:2, 114:17-24, 115:24-116:8; Holt, Trial Tr. vol. IV, 8:21-9:25; Ex. Y5, and Z5).

139.    The respondents in the control cell were shown a search results page nearly identical to what the respondents in the test cell saw, except that the listing for "Atlas Trucking &

_____

[31] According to Plaintiffs, Ms. Holt designed and ran a modified version of a "*Squirt* survey," which they purport has its origins in *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1089 (8th Cir. 1980).

Logistics" was replaced with a listing for "Arcade Trucking & Logistics." Two percent of the respondents in the control cell believed that Plaintiffs' Atlas Logistics' website and Arcade Trucking & Logistics' website are from the same company or have a business affiliation or a business connection with each other. (Holt, Trial Tr. vol. IV, 14:10-15:1, 15:21-16:2, 16:14-22; Ex. A6, B6; C6)

140.    By subtracting the 2 percent "noise" figure in the control cell from the 21 percent figure in the test cell, Ms. Holt arrives at a 19 percent net confusion rate and concludes that "past and prospective consumers of Atlas Trucking & Logistics are likely to be confused regarding an association between Atlas Trucking & Logistics and Atlas." (Holt, Trial Tr. vol. IV, 17:2-25)

141.    The use by both parties of the mark ATLAS LOGISTICS is likely to cause confusion as to the source or affiliation of the parties' respective services. (ECF No. 112, PageID 4047).

## CONCLUSIONS OF LAW

## VII.    The Parties' Claims

142.    Plaintiffs have brought trademark infringement claims against Defendants, under 15 U.S.C. §§ 1114(1) and 1125(a), for their use of ATLAS. Defendants have counterclaimed, under 15 U.S.C. § 1125(a), against Plaintiffs' use of ATLAS LOGISTICS.

143.    Plaintiffs can prevail on their claims, and can defeat Defendants' counterclaims, if they establish that Defendants' use of ATLAS, including ATLAS LOGISTICS, creates a "likelihood of confusion" in light of Plaintiffs' ATLAS marks.

144.    If the Court does not find a likelihood of confusion, however, Plaintiffs can still defeat Defendants' counterclaims, and enjoin Defendants' use of ATLAS LOGISTICS, if Plaintiffs prove that they have priority of use in ATLAS LOGISTICS. Plaintiffs argue they have

priority for two independent reasons: first, they used ATLAS LOGISTICS as a trademark before Defendants did; and second, because Plaintiffs can "tack" their use of ATLAS LOGISTICS onto their use of ATLAS, which also pre-dates Defendants' use of ATLAS LOGISTICS.

## VIII.    Plaintiffs' Lanham Act Claims Based on Their Use of ATLAS

145.    Plaintiffs allege that Defendants' use of each of the marks shown below infringes Plaintiffs' rights in ATLAS under 15 U.S.C. §§ 1114(1) and 1125(a):

- ATLAS

- ATLAS TRUCKING

- ATLAS TRUCKING COMPANY (and ATLAS TRUCKING COMPANY, LLC)

- ATLAS LOGISTICS (and ATLAS LOGISTICS, LLC)

- 

- 

The Court's resolution of these allegations depends on whether Defendants' use of ATLAS and ATLAS-formative marks creates a "likelihood of confusion" with Plaintiffs' use of ATLAS and ATLAS-formative marks. As discussed below, the Court finds a likelihood of confusion exists.

146.    To succeed on their Lanham Act claim, whether under 15 U.S.C. §§ 1114(1) or 1125(a), Plaintiffs must show: (a) ATLAS is a valid trademark; (b) that Plaintiffs used ATLAS before Defendants did so; and (c) a likelihood of confusion resulting from Defendants' use of

ATLAS. *See Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013). The Court addresses each element below.

### a.   ATLAS is a Valid Trademark

147.   "Marks fall on a 'spectrum' that ranges, in order of increasing strength, from (1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful." *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 795 (6th Cir. 2015) (quoting *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1116-17 (6th Cir. 1996)).

148.   Suggestive marks are inherently distinctive and therefore valid. *Burke v. Cumulus Media, Inc.*, No. 16-CV-11220, 2016 WL 3855181, at *15 (E.D. Mich. July 15, 2016). On a summary judgment record, this Court found that ATLAS is a suggestive mark. *AWGI*, 381 F.Supp.3d at 847.

149.   The additional evidence that Plaintiffs adduced at trial confirms the Court's earlier conclusion that ATLAS is a suggestive mark.

150.   A "suggestive" mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Champions Golf Club*, 78 F.3d at 1117. "Examples are CITIBANK, which connotes an urban or modern bank, or GOLIATH, for wood pencils, connoting a large size." *Id*.

151.   Trademark rights are tied to the goods or services on which the trademarks are used, so a mark can be strong when used with certain goods or services, but weak when that same mark is used with other goods or services. For example:

> PUMPKIN would be *generic* for the round orange gourd, *descriptive* of pumpkin-scented hand lotion, *suggestive* of Halloween costumes, and *arbitrary* for, say, toilet paper or ironing boards. Thus, the word PUMPKIN by itself cannot be said

to be generic, descriptive, suggestive or arbitrary. Jerome Gilson, GILSON ON TRADEMARKS, § 2.01 (2018) (emphasis added).

152.     Here, the term "atlas" has a recognized meaning, and that meaning is related to Plaintiffs' Services. To almost everyone, "atlas" refers to a book of maps or charts. (Holt, Trial Tr. vol. IV, 20:5-8).  Navigational tools, such as an atlas, are certainly related to, and suggestive of, Transportation and Logistics Services.

153.     In addition, the U.S. Patent & Trademark Office issued Reg. No. 3,718,117 for ATLAS. (FF 69). The Registration is incontestable pursuant to 15 U.S.C. § 1065. (ECF No. 112, PageID 4049-4050).  Incontestability constitutes "conclusive evidence of the validity of the registered mark." 15 U.S.C. § 1115(b). Incontestability also constitutes conclusive evidence of Atlas Van Lines, Inc.'s ownership of ATLAS and of its exclusive right to use the mark in commerce. *See Id*.

154.     Thus, Plaintiffs' Marks are valid and protectible.

**b.     Plaintiffs Used ATLAS Before Defendants Used ATLAS**

155.     Defendants stipulated that Plaintiffs used ATLAS before Defendants used the mark ATLAS LOGISTICS. (ECF No. 112, PageID 4049). And evidence adduced at trial clearly shows that Plaintiffs used ATLAS for Transportation and Logistics Services before Defendants used ATLAS for those Services. (Johnson, Trial Tr. vol. II, 43:18-23, 45:5-9; McConnell, Trial Tr. vol. III, 82:1-15; Wahl, Trial Tr. vol. I, 50:24-51:1, 69:18-70:6, 74:1-3, 78:15-19; Wahl, Trial Tr. vol. II, 10:17-21; Banks, Trial Tr. vol. II, 29:3-20; McConnell, Trial Tr. vol. II, 110:4-23; Goodman, Trial Tr. vol. V, 48:20-50:7; Exs. I4, H4, and T1).

**c.    Defendants' Use of ATLAS Creates a "Likelihood of Confusion"**

156.    In assessing the likelihood of confusion, the Court considers: (1) the strength of the plaintiff's mark; (2) the relatedness of the parties' services; (3) the similarity of the parties' marks; (4) evidence of actual confusion; (5) the parties' marketing channels; (6) the likely degree of the relevant purchasers' care; (7) the defendant's intent in selecting the challenged mark; and (8) the likelihood of expansion of the parties' services. *Frisch's Rests., Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982).

157.    Plaintiffs need not establish that all, or even most, of the *Frisch* factors are in their favor to prevail. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). The factors do not imply "mathematical precision" or a particular balancing formula. *CFE Racing Prods. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). Instead, the "factors are interrelated in effect" and act as a "guide to help determine whether confusion is likely." *Id.*

158.    In making a "weighted evaluation of the pertinent facts in arriving at the legal conclusion of confusion," *Frisch's Rest., Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir. 1985), the most important factors are the similarity of the parties' marks and the strength of the plaintiff's mark. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012); *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002).

159.    "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Grp.,* 931 F.2d at 1107;. *see also* 15 U.S.C. §§ 1114(1) and 1125(a) (proscribing use of marks that create a likelihood of confusion, mistake, or deception as to the "affiliation, connection, or associations" between the parties and/or their services, or as to their "origin, sponsorship, or approval").

### i.    The Strength of Plaintiffs' ATLAS Mark

160.    "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *Champions Golf Club*, 78 F.3d at 1117.

161.    A mark's strength includes two separate components: "(1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 428 (6th Cir. 2017) (quoting *Maker's Mark Distiller*y, 679 F.3d at 419) (internal citations omitted).

162.    **ATLAS is Conceptually Strong**. As discussed earlier, ATLAS is suggestive when used for Transportation and Logistics Services and is therefore a relatively strong mark.

163.    The USPTO's registration of ATLAS further supports the Court's conclusion on the conceptual strength of the mark. *Wynn Oil*, 839 F.2d at 1190 ("[i]n light of the suggestive characteristics of the mark, and the United States Patent and Trademark Office's recognition of the mark, we hold that [the mark] is a relatively strong mark, worthy of full protection"). So, too, does the USPTO's acknowledgement of the incontestability of the ATLAS mark. *Maker's Mark*, 679 F.3d at 420; *Daddy's Junky Music*, 109 F.3d at 282; *Wynn Oil*, 839 F.2d at 1186-87.

164.    **ATLAS is Commercially Strong**. A mark is commercially strong if it is "unique, [if] it has received intensive advertisement, or both." *Daddy's Junky Music*, 109 F.3d at 280. *See also Maker's Mark*, 679 F.3d at 419 (discussing plaintiff's advertising as evidence of commercial strength). Here, Plaintiffs satisfy both.

165.    As discussed above, Plaintiffs' marks are unique because they are suggestive for Transportation and Logistics Services. (CL ¶ 150-152)

166.     Plaintiffs have also intensively advertised the ATLAS Brand by, for example: spending tens of millions of dollars in nationwide advertising, spanning traditional print and extending to social media and online, resulting in billions of dollars in earned revenue under the ATLAS Brand; licensing the ATLAS Brand to their nationwide network of agents, who serve as representatives of the ATLAS Brand, and who receive marketing support from Plaintiffs on website development, brochures, presentations, and "anything that they need [Plaintiffs'] assistance with"; displaying the ATLAS Brand on each of their agents' roughly 3,000 trailers; and displaying the ATLAS Brand through sales people, load boards, and at industry trade shows.

167.     The uniqueness and intensive advertisement of the ATLAS Brand establishes its commercial strength.

168.     Defendants argue that ATLAS is commercially weak because many third parties use ATLAS. To establish this argument, Defendants must present evidence that third parties (1) do, in fact, use ATLAS (2) for Transportation and/or Logistics Services. *See Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 557 (6th Cir. 2013); *Daddy's Junky Music,* 109 F.3d at 281.

169.     The only evidence Defendants presented to support their argument–searches Defendants ran in 2012, 2019, and at trial – does not establish that any individual or company is using, or ever used, ATLAS. Nor does the evidence offer any information on the extent of any such use, in terms of, for example, the goods or services offered under the marks, length of use, geographic reach, trade channels, or advertising media used.

170.     Moreover, the TESS searches included dead trademark applications and registrations, and included many marks that bear no similarity to the parties' marks; for example: CAPTAIN ATLAS AND THE GLOBE RIDERS; CABLE & STATION COVERAGE ATLAS; and CHRYSLER LASER ATLAS SATELLITE SYSTEM (Ex. 85, Entry Nos. 1787; 1862; and

1825). Nor were the TESS searches limited to use of ATLAS for any particular services; instead, "they're 'Atlas' for anything." (Gunsberg, Trial Tr. vol. VI, 62:15-63:4).

171.    Similarly, the SAFER searches identified only marks that consisted of "Atlas something" and showed only "companies that have *authority* to transport" goods. Defendants presented no evidence on whether any of the companies, in fact, transports or ever transported goods. Moreover, some of the companies "are dead, some of them are discontinued."

172.    Defendants' general and undeveloped evidence is therefore not probative of the commercial strength (or lack thereof) of ATLAS. This is particularly evident when measured against, for example, the defendant's more specific–but still insufficient—evidence in *Lucky's Detroit*, which consisted of a search of online listings for restaurants using the term "Lucky's," "Lucky," and "Luckies"; a list of marks registered by the U.S. Patent & Trademark Office that include the term "Lucky's" in connection with restaurant services; and an affidavit from a third party claiming to use LUCKY'S PUB. The Sixth Circuit found that the evidence lacked probative value:

> [M]erely showing the existence of marks in the records of the [USPTO] will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order for market conditions to carry weight, a defendant must show what actually happens in the marketplace. … [Defendant] presented no evidence that the businesses listed online are actively using the marks in operating restaurants.

*Lucky's Detroit*, 533 F. App'x at 557 (internal citations omitted).

173.    Similarly, in *Daddy's Junky Music*, the Sixth Circuit held that the District Court erred in reducing the commercial strength of the plaintiff's marks when it relied on trademark registrations and applications owned by third parties that included the word DADDY'S. The registrations did not, without more, "show what actually happens in the marketplace." *Daddy's*

*Junky Music*, 109 F.3d at 281 (quoting *Homeowner's Grp.*, 931 F.2d at 1108). Trademark applications are even less relevant because they can be filed before the mark is used. *See* 15 U.S.C. § 1051(b).

174.    Defendants must also show that the third parties who actually use ATLAS do so in the transportation and logistics industry. Defendants presented no evidence that any third party uses, or ever used, ATLAS to offer Transportation or Logistics Services, or even in the transportation and logistics industry. The absence of such evidence is fatal to Defendants' argument. In *Maker's Mark*, the Sixth Circuit affirmed the District Court' rejection of the defendant's evidence of third-party use because the third parties used their marks for distilled spirits, whereas the plaintiff used its mark for bourbon, which is only one type of distilled spirit. 679 F.3d at 420-21.

175.    Defendants' evidence attacking the commercial strength of ATLAS therefore fails in two respects, each of which is individually fatal. Defendants presented no evidence (1) that any the third party *actually uses* ATLAS, or that (2) any third party makes such use in offering Transportation or Logistics Services. Accordingly, the Court finds that Defendants have not established that the commercial strength of ATLAS has been weakened.

176.    The first *Frisch* factor–the strength of ATLAS–weighs in favor of finding a likelihood of confusion.

### ii.    The Relatedness of the Parties' Services

177.    Services are related to one another if they are "are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Daddy's Junky Music*, 109 F.3d at 1179 (quoting *Homeowners Grp.*, 931 F.2d at 1109).

178.    The parties offer the same Transportation Services. Plaintiffs transport many of the same goods that Defendants transport; and Defendants transport many of the goods that Plaintiffs transport. (FF ¶ 20 and ¶ 81). The parties do so either themselves or by brokering shipments through others. (FF ¶ 94). Defendants tried to establish that they transport only steel bars, coils, and rods. The evidence at trial, however, showed otherwise: Defendants actively seek out and transport any type of good, including goods that Plaintiffs transport. (FF ¶ 81; Bronson, Trial Tr. vol. VI, 24:5-25:19). The Court therefore finds that the parties engage in at least some of the same Transportation Services.

179.    Even if Defendants transported only steel bars, coils and rods, however, it would not matter. The parties' Transportation Services are similar enough to support a likelihood of confusion under the Lanham Act. Goods or services need not be competitive with one another to be related under this *Frisch* factor. *Daddy's Junky Music*, 109 F.3d at 282. For example, the Sixth Circuit has held the following goods/services to be related for purposes of the likelihood of confusion analysis: bulk car wash products and car wash franchises; oxygenating septic filters and attachments for septic filters; and an Italian restaurant and a pizza carry-out operation. *See Wynn Oil*, 943 F.2d at 600-01; *Jet, Inc. v. Sewage Aeration Sys.,* 165 F.3d 419, 422 (6th Cir. 1999); and *Little Caesar Enters.,* 834 F.2d at 571.

180.    The Court also evaluates the relatedness of the parties' Transportation Services in light of the similarity between the parties' marks (discussed below). *Daddy's Junky Music,* 109 F.3d at 282. Because the parties' marks are either literally or legally identical to one another, the parties' Transportation Services are related under *Frisch*.

181.    Moreover, even if the parties offered different Transportation Services, Defendants' *Logistics Services* are identical and/or highly related to Plaintiffs' Transportation and Logistics Services.

182.    In *Ryder System, Inc. v. Storage & Moving Services, Inc.*, No. 13-61466-CIV, 2013 WL 3873231 (S.D. Fla. July 25, 2013), the plaintiff offered "commercial truck leasing, rental and maintenance, and supply chain logistics" and the defendant transported household furnishings. *Ryder Sys.*, 2013 WL 3873231, at *1. In finding the relatedness of the goods factor in favor of plaintiff, the court stated:

> Defendant offers nearly identical – albeit on a smaller scale – services to those of Plaintiff. Even though Plaintiff is not in the specific business of packing a customer's furnishings and having its employees physically load and unload them from its trucks, the businesses of the parties are sufficiently related that it is natural for the public to assume – indeed, the public has assumed – that Ryder is the sponsor of or affiliated with Defendant's business.

*Id*. at *5.

183.    Similarly, the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent & Trademark Office ("USPTO") has refused to register similar marks that are used to offer both transportation and logistics services.[32] For example, the TTAB refused to register a mark for "logistics services" where a similar mark had already been registered for "freight transportation

---

[32] The TTAB is an appellate tribunal within the USPTO that decides, among other things, whether a trademark applicant can register its trademark. *See* www.uspto.gov/about/offices/ogc/ttab.jsp. The Sixth Circuit often relies on TTAB cases for trademark-related issues. *See also*, *e.g.*, *Sterling Jewelers, Inc. v. Artistry Ltd.*, 896 F.3d 752, 755 (6th Cir. 2018); *NetJets Inc. v. IntelliJet Grp.*, LLC, 678 F. App'x 343, 348 (6th Cir. 2017); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). *See also Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 863 (6th Cir. 2017).

brokerage services." *In re Trinity Transport, Inc.*, 2015 WL 4779204, at *2 (TTAB July 30, 2015). The TTAB explained that "both [parties] transport goods for others, arranging for pick-up, delivery, storage and transportation of freight, the services overlap." *Id.*, at *5.

184.     In another case, *In re Cardinal Logistics Mgmt.*, 2017 WL 665728 (TTAB Feb. 8, 2017), the TTAB refused to register a mark for "transportation logistics services" where a similar mark had already been registered for "railroad transportation services." *Id.*, at *2. The TTAB found that the services "are commercially related, such that if they were offered under similar marks, customers would believe that they could come from the same source." *Id.*, at *4. Here, the Parties' Services are even more related than the services at issue in *In re Cardinal Logistics.*

185.     Moreover, Defendants' Senior Director of Transportation, Mr. Bronson, testified that "transportation and logistics are the same." (FF 2; Bronson, Trial Tr. vol. V, 130:14-17). Further, Ms. Johnson, Plaintiffs' Vice President of Corporate Marketing, testified that Transportation and Logistics services are "closely related" to one another, "intermingled, if you will." She continued, "you can't really conduct transportation services without having some logistical element in it." (FF 2).

186.     Moreover, Plaintiffs' Vice President of Strategic Planning testified that "pretty much every moving company does logistics." (McConnell, Trial Tr. vol. II, 137:21-22). Indeed, Plaintiffs provide both Transportation and Logistics Services, as do others in the industry. (McConnell, Trial Tr. vol. II, 119:21:120:2).

187.    The closer relationship between Logistics and Transportation Services explains why Defendant Atlas Logistics was created: to be an "adjunct" to Atlas Trucking. Defendants also provide both Transportation Services and Logistics Services to some of the same customers.[33]

188.    Mr. Bronson also testified that if Defendant Atlas Trucking cannot itself accept a load, it will try to broker the load through Defendant Atlas Logistics. In addition, Defendants offer their Transportation and Logistics Services through the same website, through the same employees, and through salespeople who sit "within shouting distance of each other."

189.    As further noted on Defendants' website homepage, Defendants are "[t]he right *logistics trucking* company" for customers. (FF 111) (emphasis added). Defendants place the two terms next to one another because of their close relationship and so customers will come to–and think of–Defendants for both.

190.    Defendants' attempt to slice their Transportation Services finely, to occupy only the narrowest possible place in the marketplace (while simultaneously marketing themselves as broadly as possible), is unpersuasive. Plaintiffs' Transportation and Logistics Services are identical to, or at a minimum, overlap with, Defendants' and Transportation and Logistics Services enough, that if offered under similar marks, customers would believe–and have believed–that such Services came from the same source.

---

[33] The following customers are listed on both Atlas Trucking's top 25 customer list and Defendant Atlas Logistics's top 25 customer list: Eaton Steel Bar Co., C H Robinson Worldwide Inc., Williams & Associates, Penske Transportation Management, Hamilton Specialty Bar, Tata Steel International (Americas) Inc., Paslin Company, ABC Supply Company, L & W Engineering, and R J Linus Steel Services.

191.    Further, Defendants have admitted a likelihood of confusion between the Parties' simultaneous use of ATLAS LOGISTICS for Logistics Services. The parties' Logistics Services must necessarily be related enough to support a likelihood of confusion. With that admission, and the close relationship between Logistics and Transportation Services, the Parties' Transportation Services must be also related enough to support a likelihood of confusion.

192.    The second *Frisch* factor weighs in favor of finding a likelihood of confusion.

### iii.        The Similarity of the Parties' Marks

193.    The dominant part of each of Plaintiffs' marks at issue is ATLAS:

- ATLAS

- ATLAS LOGISTICS

- ATLAS – THE AGENTS' VAN LINE

- 

The word LOGISTICS is a generic descriptor of Plaintiff's ATLAS Logistics Services.[34] The words THE AGENTS' VAN LINE similarly describe Plaintiffs' services and do not add to the distinctiveness of ATLAS. And the stylized A only adds a visual component to the ATLAS mark.

---

[34] Before the USPTO would issue the registration for ATLAS LOGISTICS, it required that Plaintiff AWGI disclaim any rights in the word LOGISTICS alone because that word "merely describes an ingredient, quality, characteristic, function, feature, purpose or use of [AWGI's] goods and/or services." (Ex. 28, at AWGI000151). The face of the ATLAS LOGISTICS

194.    Each of Defendants' marks at issue likewise includes ATLAS as the dominant factor:

- ATLAS

- ATLAS TRUCKING

- ATLAS TRUCKING COMPANY (and ATLAS TRUCKING COMPANY, LLC)

- ATLAS LOGISTICS (and ATLAS LOGISTICS, LLC)





-

And as with Plaintiffs' marks, all words other than ATLAS are generic descriptors of the services Defendants offer under their marks: specifically trucking and logistics.

195.    Each party uses the identical mark ATLAS.

196.    The words added to Defendants' other marks do not reduce the likelihood of confusion because they are all generic. In *CFE Racing*, the Sixth Circuit faced a similar situation. The plaintiff used BMF for cylinder heads, and the defendants used BMF Wheels for wheels. The Sixth Circuit held:

---

registration therefore includes the following disclaimer: "No claim is made to the exclusive right to use 'logistics,' apart from the mark as shown." (Ex. S).

69

> A reasonable jury could find that Defendants' marks were nearly identical to Plaintiff's registered and unregistered marks. In "BMF Wheels," the letters "BMF" provide the dominant identifier as the non-generic element of the composite. The dominant role of the letters "BMF" in Defendants' mark plainly contributes to a likelihood of confusion with Plaintiff's registered trademark for the letters "BMF," without restriction as to font, style, size, or color. *See, e.g., Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1570 (Fed. Cir. 1983) (finding likelihood of confusion supported by the dominant role of the word "giant" in the two relevant marks, "GIANT FOOD" and "GIANT HAMBURGERS").

*CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015).

197.    The Court rejects Defendants' argument that a finding in Plaintiffs' favor on this factor requires a violation of the anti-dissection rule. The Court has examined the parties' marks in their entireties, without ignoring or dissecting the marks. Nevertheless, the dominance of ATLAS in the parties' marks is inescapable and the Sixth Circuit has explained that "assigning greater weight to a dominant feature of a mark is permissible." *Daddy's Junky Music*, 109 F.3d at 284 n.4.

198.    In *In re Nat'l Data Corp.*, 753 F.2d 1056 (Fed. Cir. 1985), the Court of Appeals for the Federal Circuit affirmed a decision of the TTAB not to register THE CASH MANAGEMENT EXCHANGE in view of an existing registration for CASH MANAGEMENT ACCOUNT. The Court acknowledged courts must consider marks in their entireties. Nevertheless:

> In articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable.

*Id.* at 1058; s*ee also In re: David Copeland Smith*, 791 Fed. Appx. 898, 900-01 (Fed. Cir. Nov. 12, 2019).

199.     Earlier in this case, the Court found that:

> the marks are undoubtedly similar. Plaintiffs have operated as "Atlas" for decades, and Defendants now operate as "Atlas Trucking" and "Atlas Logistics." When presented with any one of the relevant marks, a consumer could conclude that they identify a common source. Thus, this factor weighs in favor of finding a likelihood of confusion.

*AWGI*, 381 F.Supp.3d at 848.

200.     The evidence presented at trial confirms the Court's earlier finding. The third *Frisch* factor therefore weighs in favor of finding a likelihood of confusion.

### iv.        Evidence of Actual Confusion

201.     "Courts have consistently held that 'evidence of actual confusion is undoubtedly the best evidence of a likelihood of future confusion.'" *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1119 (6th Cir. 1996) (quoting *Wynn Oil Co. v. Am. Way Serv. Corp.,* 943 F.2d 595, 601 (6th Cir. 1991)). "There is no requirement that evidence of actual confusion to be relevant, must be confusion at the point of sale—purchaser confusion— and not the confusion of nonpurchasing, casual observers." *Id*. (internal citations omitted).

202.     Plaintiffs introduced evidence of five people experiencing actual confusion from Defendants' use of ATLAS: a truck driver who submitted an employment application to Defendant Atlas Trucking when he had intended to submit it to Plaintiffs; two people who called Defendants looking for household moving services, when they intended to call Plaintiffs; a police officer who thought that a truck belonged to Defendant Atlas Trucking when in fact, it belonged to Plaintiff Atlas Van Lines; and one person who complained about dangerous driving by someone in a truck that she believed was owned by Defendant Atlas Trucking when it, fact it was owned by Plaintiff Atlas Van Lines. (FF ¶ 132 and 134).

203.    Even if the Court were to discount the weight of the actual confusion of the non-purchasing individuals, Plaintiffs' evidence still supports a finding of actual consumer confusion – which is the best evidence of a likelihood of confusion. *See Daddy's Junky Music*, 109 F.3d at 284.

204.    Plaintiffs' survey showing a 19% confusion rate further supports Plaintiffs' claim, as circumstantial evidence of a likelihood of confusion. *See* J. Thomas McCarthy, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:184 (5th ed. 2020)*; RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (confusion rate of 15-20 percent is "substantial evidence" of a likelihood of confusion); *Exxon Corp. v. Tex. Motor Exch. Of Houston*, 628 F.2d 500, 507 (5th Cir. 1980) (confusion rate of 15 percent is strong evidence of a likelihood of confusion); *Burroughs, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) (15 percent confusion rate sufficient).

205.    The fourth *Frisch* factor therefore weighs in favor of finding a likelihood of confusion.

### v.        The Parties' Marketing Channels

206.    This factor considers "how and to whom the respective goods or services of the parties are sold." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 502 F.3d 504, 519 (6th Cir. 2007) (quoting *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006)).

207.    This Court previously found that both parties use their websites as marketing tools. Evidence at trial confirmed that finding. (Exhs. K6 and S2). Although Defendants would not characterize websites as advertising—choosing instead to describe them as merely "establishing yourself as a relevant company" (Bronson, Trial Tr. vol. VI, 35:18-23)—the Court rejects this

characterization. Defendants admitted that they offer their services on their website, they promote their companies on their website, and they ask potential customers who visit their website to call them to provide services. (Bronson, Trial Tr. vol. VI, 35:25-36:6). Defendants' websites even allow visitors to "request a quote" for their services. (Exs. K6 and L6)

208.     Evidence at trial further established that both parties use other identical marketing channels to promote their companies and offer their services, including social media (for example, Facebook Twitter, Instagram, and LinkedIn), load boards, and salespeople. And the parties have common customers.

209.     The fifth *Frisch* factor therefore weighs in favor of finding a likelihood of confusion.

### vi.        The Degree of Relevant Consumers' Care

210.     Neither Plaintiffs nor Defendants provided any evidence at trial on the degree of care Defendants' customers exercised when choosing or using Defendants' Transportation Services.[35]

211.     Even if they had done so, it would not reduce the likelihood of confusion because both parties use the same mark: ATLAS.

> The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue. … That is, confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party.

---

[35] Although the record has evidence suggesting that *Plaintiffs'* consumers "pay attention" or "are sophisticated" (McConnell, Trial Tr. vol. III, 54:13-18), the likelihood of confusion looks to the accused infringer's customers.

*Daddy's Junky Music*, 109 F.3d at 286;  *see also Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 364–65 (6th Cir. 1984) ("Being skilled in their own art does not necessarily preclude their mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field") (quoting *Wincharger Corp. v. Rinco, Inc.* 297 F.2d 261, 264 (C.C.P.A. 1962)).

212.     The sixth *Frisch* factor is neutral.

**vii.       Defendants' Intent in Using ATLAS**

213.     Defendants need not have intended to infringe, or to trade on the good will of, Plaintiffs' ATLAS mark to be liable under the Lanham Act. *See Wynn Oil*, 839 F.2d at 1189 ("intentional copying is not a requirement under the Lanham Act") (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)).

214.     However, "the *presence* of intent can constitute strong evidence of confusion." *Daddy's Junky Music*, 109 F.3d at 287 (emphasis in original).[36] The Plaintiffs need not present direct evidence of intentional copying to prove intent. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.* at 286.

215.     Decades before Defendants began to use the relevant marks, Plaintiffs had extensively used and advertised ATLAS for Transportation Services. (FF 52 and 53). That creates

---

[36] "The converse of this proposition, however, is not true: the *lack* of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source. Intent therefore is an issue whose resolution may benefit only the cause of the senior user, not of the alleged infringer." *Daddy's Junky Music*, 109 F.3d at 287 (citations omitted). Accordingly, even if this Court had found that the Defendants had only good intentions in using ATLAS, that finding would not decrease the likelihood of confusion. *Id.*

a presumption that Defendants knew of Plaintiffs' ATLAS mark. *See Daddy's Junky Music*, 109 F.3d at 286.

216.     The Court need not, however, rely on this presumption. Defendants admitted that they knew of Plaintiffs' use of ATLAS before Defendants began using ATLAS. (FF ¶ 103). The companies' Vice President of Strategic Planning and General Counsel also testified that the Defendants were advised of the continued risk of using ATLAS, at least by 2016 and perhaps as early as 2012. (Gunsberg, Trial Tr. vol. VI, 111:3-115:5). Defendants, however, continued using ATLAS.

217.     Defendants stipulated in the Joint Final Pretrial Order that: "At the time Defendants first used 'Atlas Logistics,' they had not conducted any investigation to determine whether 'Atlas Logistics' was available as a trademark." The Defendants' stipulation conclusively binds them. *See Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) ("Factual assertions in … pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them").

218.     Defendants' interrogatory answers similarly establish that Defendants did not conduct any investigation or perform any trademark search to determine whether ATLAS or ATLAS LOGISTICS was available to use as a trademark before they began using ATLAS or ATLAS LOGISTICS. (FF 121).

219.     Nevertheless, Mr. Mark Goodman, one of Defendants' founders, testified that in 2003, they had a tax attorney "look through the LARA database, like, to see if the name's being used. … [T]here was no Atlas Logistics. So, we felt okay to use the name." (Goodman, Trial Tr. vol. V, 47:11-19, 55:15-56:10). The Court gives no weight to Mr. Goodman's testimony that expressly contradicts Defendants' stipulation and interrogatory answers.

220.    Even if the Court were to consider Mr. Goodman's testimony, it would not improve Defendants' position. The information on the LARA database is extremely limited. For example, it covers only business entities that are formed in Michigan. (Goodman, Trial Tr. vol. V, 47:11-19). Moreover, it includes companies in any industry. (Goodman, Trial Tr. vol. V, 55:25-56:6). And it expressly warns users of the database not to use information in the database in deciding whether to use a particular name:

> It should be noted that while a trademark may be distinguishable on our record, this difference might not be enough to avoid infringing on business names filed with the county clerk or the Bureau, or nationally registered trademarks and service marks. If an infringement does occur, the applicant could be sued and forced to pay damages for infringement to the person or entity that has superior legal rights to the mark. The responsibility to avoid infringement rests with you, and care should be taken in choosing a mark.

(https://www.michigan.gov/lara/0,4601,7-154-89334_61343_35413_35431-138688--,00.html).

221.    The facts presented at trial constitute circumstantial evidence of Defendant's adverse intent, in the form of Defendants' use of ATLAS with knowledge of Plaintiffs' prior use of ATLAS and Defendants' failure to exercise diligence before using ATLAS.

> It is the second user's responsibility to avoid confusion in its choice of a trademark, and that responsibility includes choosing a trademark whose salient portion would not likely be confused with the first user's trademark. … The responsibility for any confusion that exists between these two service marks lies with [the junior user], not [the senior user].

*D&J Master Clean, Inc. v. Servicemaster Co.,* 181 F. Supp. 2d 821, 826 (S.D. Ohio 2002).

222.    The seventh *Frisch* factor therefore weighs in favor of finding a likelihood of confusion.

### viii.        The Likelihood the Parties Will Expand Their Services

223.    The parties offer identical, or at least overlapping, Transportation and Logistics Services. Accordingly, this factor is not relevant to the Court's analysis.

224.    If, however, the parties' services were not so related to one another, then this factor would weigh in Plaintiffs' favor if there is a strong possibility that either party will expand its business: to compete with the other; to be marketed to the same consumers; or to increase the types of services offered. *Daddy's Junky Music,* 109 F.3d at 287 ((citing *Homeowners Group,* 931 F.2d at 1112) (citing *Restatement of Torts § 731(b)* & comment c (1938)).[37]

225.    The evidence at trial showed that both parties are expanding their services. Plaintiffs continually grow and expand all facets of their business by, for example, recruiting new agents to serve different types of services and locations, and continually looking for merger and acquisition opportunities. (FF 6 and 74). Such growth and expansion is in service of improving Plaintiffs' existing business and adding related services that may be adjacent to Plaintiffs' current services. (*Id*.)

226.    Similarly, Defendants are "expanding what [they] do." (Bronson, Trial Tr. vol. VI, 40:5-8). For example, although Defendants may not have previously arranged for a certain type of shipment, it would do so "if somebody needed to and it were a money-making opportunity." (Bronson, Trial Tr. vol. V, 118:4-12).

---

[37] As with "the seventh [*Frisch*] factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary." *Daddy's Junky Music,* 109 F.3d at 288 (emphasis in original). Thus, even if this Court were to find that neither party intended to expand, that fact would neither reduce nor increase the likelihood of confusion.

227.    Evidence of the parties' plans to expand further increases the likelihood of confusion.

228.    The eighth *Frisch* factor therefore favors a finding of a likelihood of confusion.

## IX.    Plaintiffs Used ATLAS LOGISTICS as a Mark Before Defendants Did, Thereby Giving Plaintiffs Priority

229.    Plaintiffs also allege that if, and only if, the Court finds that Defendants' use of ATLAS LOGISTICS does not violate Plaintiffs' rights in ATLAS under *Frisch*, Defendants' use of ATLAS LOGISTICS still infringes Plaintiffs' rights in ATLAS LOGISTICS under 15 U.S.C. §§ 1114(1) and 1125(a). Defendants allege the same claim, only in reverse: that Plaintiffs' use of ATLAS LOGISTICS infringes Defendant's rights in ATLAS LOGISTICS under the same statutes.

230.    The parties' assertion of these mirror-image claims produced a pre-trial stipulation that the parties' simultaneous use of ATLAS LOGISTICS creates a likelihood of confusion. (FF 141). The only disputed question is whether Plaintiffs or Defendants first used ATLAS LOGISTICS in a manner that created trademark rights that pre-date Plaintiffs' first use of ATLAS LOGISTICS. As discussed below, the Court finds that, because Plaintiffs made prior use of ATLAS LOGISTICS as a trademark, they are the senior users, and therefore have superior rights to any rights Defendants may have.

231.    Defendants rely on an invoice dated September 16, 2005, as their first use of ATLAS LOGISTICS. (FF 119). The Court finds that the invoice does not use ATLAS

LOGISTICS as a trademark, and therefore does not give Defendants rights in ATLAS LOGISTICS as of that date.[38]

232.     Trademark rights are based on the common law and begin upon use of the mark.

233.     One of the bedrock principles of trademark law is that trademark or "service mark ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 356 (6th Cir. 1998), quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir. 1991).

234.     The first use of a word need not be extensive or result in deep market penetration or widespread recognition to create trademark rights. *Allard*, 146 F.3d at 358. However, "there has to be an 'open' use [of the mark], that is to say, a use has to be made to the relevant class of purchasers or prospective purchasers." *Kelly Servs., Inc. v. Creative Harbor, LLC*, 124 F. Supp. 3d 768, 770 (E.D. Mich. 2015). The test is "whether or not the use was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Id.* (quoting *Mountain Top Beverage Group, Inc., v. Wildlife Brewing N.B., Inc.,* 338 F. Supp. 2d 827, 835 (S.D. Ohio 2003), *aff'd*, 432 F.3d 651 (6th Cir. 2005)).

235.     Defendants' invoice does not constitute open or public use of ATLAS LOGISTICS. *See Kelly Servs.,* 124 F. Supp. 3d at 777. It is, instead, a private communication between two companies. *See S Indus., Inc. v. Diamond Multimedia Sys.,* Inc., 991 F. Supp. 1012, 1019 (N.D. Ill. 1998) ("Plaintiff produced eight invoices for sales in 1986–1989. Invoices alone cannot

---

[38] The Court's discussion on the September 16th invoice applies equally to Defendants' nearly identical invoice dated September 23, 2005.

demonstrate trademark use."); *Lucent Info. Mgmt. v. Lucent Techs., Inc.*, 986 F. Supp. 253, 259 (D. Del. 1997) (discussing the standard of proof of user needed to establish trademark ownership).

236.    This contrasts with *Allard* where the Sixth Circuit found sufficient public use where the party claiming prior rights offered its services to potential customers through "numerous solicitations bearing the mark." *Kelly Servs.*, 124 F. Supp. 3d at 777.

237.    Moreover, the invoice does not show that Defendants provided Logistics Services to the recipient. The invoice shows only the rendition of Transportation Services. The words "Conversion Item" are under the "Shipped:" heading. A conversion item refers to shipments of products that are converted from one form to another; such as from whole to pieces, or from long to short, or from hot to cold. (Goodman, Trial Tr. vol. V, 54:8-21). Under the "Shipped Quantity" heading is the number "1.00."

238.    In addition, the Defendants' only witness who testified about the invoice did not testify, even on direct examination, that Defendants issued the invoice as compensation rendering Logistics Services, which it must do to establish priority for Logistics Services. (Goodman, Trial Tr. vol. V, 48:16-49:10).

239.    To the extent Defendants contend that the formation of Defendant Atlas Logistics LLC in 2003 gave them *trademark* rights in ATLAS LOGISTICS beginning in 2003, the law expressly holds otherwise. *See George Washington Mint, Inc. v. Washington Mint, Inc.*, 349 F. Supp. 255, 260, (S.D.N.Y. 1972) ("The prior incorporation of the defendant, in itself, does not establish priority of trademark use"); *Rigdon v. Olson*, No. 91209598, 2016 WL 7010640, at *6 (Oct. 26, 2016) ("Since use is the basis for obtaining exclusionary rights, merely obtaining a corporate charter under a corporate name does not itself confer rights in the name without actual usage," quoting MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 9:2 (4th ed.));

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:12 (5th ed.) ("The mere act of incorporation alone does not establish priority of use of the corporate name as a mark").

240.    Unable to establish that they used ATLAS LOGISTICS for Logistics Services before 2007 (Plaintiffs' priority date), Defendants advance three arguments to attack Plaintiffs' priority date.

241.    First, Defendants argue that Plaintiffs could not acquire trademark rights in ATLAS LOGISTICS before the company Plaintiff Atlas Logistics, Inc. came into existence, which Defendants inaccurately contend was on January 9, 2015. Plaintiff Atlas Logistics, Inc. was originally formed as Atlas Relocation Services, Inc. on December 11, 1995. (Ex. 31). That company changed its name to AWG Logistics, Inc. on June 8, 2012. (Ex. 32). That company then changed its name to Atlas Logistics, Inc. – that is, to the Plaintiff – on January 8, 2015. (Ex. 33). Thus, Plaintiff Atlas Logistics, Inc. has been in existence since December 11, 1995. The fact that it has had different corporate names over that period is irrelevant; it has been the same corporate entity since 1995. That entity began using ATLAS LOGISTICS in 2007 and has continued to do so, regardless of corporate name changes in 2012 and 2015.

242.    Defendants then argue that Plaintiffs did not begin to accrue rights in ATLAS LOGISTICS until 2013, when Plaintiffs reorganized their operations to gain organizational efficiencies. Plaintiffs Atlas Logistics's President and COO testified that the reorganization moved three entities under one management group "to provide a more efficient service offering, and also to capture some efficiencies between the three entities from an economical perspective." (Wahl, Trial Tr. vol. I, 78:8-14). Those managerial moves did not eliminate Plaintiffs' use of ATLAS LOGISTICS for Logistics Services since then, nor did it change their use of the mark for the Services afterward.

243.    Defendants' last point out that Plaintiffs did not acquire the domain name www.atlaslogistics.com until 2013. Their acquisition of the domain name followed by their running of the website *added* to their use of ATLAS LOGISTICS. It could not eliminate from the record the Plaintiffs' use of ATLAS LOGISTICS for Logistics Services that began in 2007 and has continued to date. And in fact, prior to the acquisition of the www.atlaslogistics.com, Plaintiff Atlas Logistics maintained a webpage on Atlas Van Lines' website, namely, www.atlasvanlines.com/logistics.

**X.    Plaintiffs' Can 'Tack' Their Use of ATLAS LOGISTICS Onto Their Use of ATLAS**

244.    Plaintiffs also allege that even if Defendants used ATLAS LOGISTICS as a trademark before Plaintiffs did, Plaintiffs have superior rights under the doctrine of "tacking." In this alternative theory, Plaintiffs contend that ATLAS LOGISTICS creates the same commercial impression as ATLAS, making the two marks legally equivalent to one another. As a result, Plaintiffs argue that they first used ATLAS LOGISTICS when they first used ATLAS for Logistics Services – in 1970, which far pre-dates Defendants' first use of ATLAS LOGISTICS. If the Court finds that Plaintiffs can tack their use of ATLAS LOGISTICS to their use of ATLAS, Plaintiffs will have priority over Defendants' use of ATLAS LOGISTICS. As discussed below, the Court finds that Plaintiffs have established tacking.

245.    Even if Defendants used ATLAS LOGISTICS before Plaintiffs did, Plaintiffs would still have priority. Under the legal doctrine of "tacking," Plaintiffs' rights in ATLAS LOGISTICS for Logistics Services related back to 1970, when Plaintiffs began using ATLAS for Logistics Services.

246.    Tacking allows trademark owners to modify their marks without losing priority. *Hana Fin, Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015). Tacking "clothe[s] a new mark with the

priority position of an older mark." *Id*. Tacking is allowed when the "original and revised marks are 'legal equivalents.'" *Id*. at 910. *See also* 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:26 (5th ed. 2020).

247.    Two marks are legal equivalents when they "create the same, continuing commercial impression" such that consumers would consider the two marks the same. *Hana Fin*., 135 S. Ct. at 909. As the factfinder in this case, the Court can determine whether two marks are legal equivalents of one another. *Id*. at 911. The Court concludes that they are.

248.    Plaintiffs first used ATLAS for Logistics Services in 1970. Plaintiffs added LOGISTICS to ATLAS in 2007 and continued to offer Logistics Services under both the original and revised marks. ATLAS and ATLAS LOGISTICS create the same commercial impression when used for Logistics Services. The dominant, distinctive portion of both marks is ATLAS. The addition of LOGISTICS does not distinguish ATLAS LOGISTICS from ATLAS when used for Logistics Services.

249.    The legal equivalency of Plaintiffs' marks matches the marks at issue in *D&J Master Clean.* There, the plaintiff had used MASTER *CLEAN* since 1989 for carpet cleaning and commercial janitorial services. *D&J Master Clean,* 181 F. Supp. 2d at 823. The defendant had used *ServiceMASTER* since at least 1954 for commercial and residential cleaning services. *Id*. When, in 1997, defendant began using (and registered) *ServiceMASTER Clean*, plaintiff moved for a preliminary injunction. *Id*. at 823-24.

250.    The Court denied the motion because under tacking, defendant's use of *ServiceMASTER Clean* was no different from its use of *ServiceMASTER*, which pre-dated plaintiff's first use of MASTER *CLEAN* by at least 35 years.

> [Defendant's] appendage of the generic term "*Clean*" to its long-established primary mark, *ServiceMASTER*, is covered by the tacking rule. … The word

"*Clean*" is purely descriptive and adds nothing of significance to the original mark. [Defendant's witness] testified that the word "*Clean*" was a "descriptor . . . an appended element to our name" used to identify the services offered by *ServiceMASTER* franchises. This minor alteration does not change the basic commercial impression [of] the *ServiceMASTER* mark … Given that Defendant's *ServiceMASTER* mark was long-established, federally registered, and widely recognized when Plaintiff chose to use its MASTER *CLEAN* mark, Plaintiff's claims of trademark infringement are precluded.

To the extent that there is a conflict between Plaintiff's MASTER *CLEAN* mark and Defendant's *ServiceMASTER Clean* mark, the latter is entitled to priority, since it is only a revised version of a trademark that has been used for nearly fifty years.

*D&J Master*, 181 F. Supp. 2d at 825-26 (italics in original; underlining added).

251.   Likewise, in *Am. Sec. Bank v. Am. Sec. & Tr. Co.*, 571 F.2d 564, 565, (C.C.P.A. 1978), the (nominal) defendant had been using AMERICAN SECURITY for banking services since 1900. In 1935, the plaintiff began using AMERICAN SECURITY BANK for banking services. *Id.* at 565. In 1973, defendant added BANK to the end of its mark and began using AMERICAN SECURITY BANK for banking services. *Id.* at 566. The Court of Customs and Patent Appeals (the predecessor to the Court of Appeals for the Federal Circuit) held that defendant had superior rights in AMERICAN SECURITY BANK. "While AMERICAN SECURITY BANK is a distinguishable, three-word mark, the word 'bank' is purely descriptive and adds nothing to the origin-indicating significance of AMERICAN SECURITY. Customers using the services would know they were dealing with a bank. We consider the marks to be legal equivalents." *Id.* at 567. The court also recognized the equities favoring defendant: "The situation here is not one where [defendant], as a latecomer, adopted a mark used for thirty-eight years by another as its name; [defendant] merely added the descriptive word BANK to a mark it had been using for seventy-three years for banking services." *Id.*

252.    ATLAS LOGISTICS and ATLAS differ only in the most meaningless way: the addition of the generic word "logistics," which adds nothing to the origin-indicating significance of ATLAS. Plaintiffs added the word only to keep up with the market, which began using "logistics" as a buzzword. Tacking is designed for precisely this type of situation, permitting a trademark owner to "respon[d] to … new advertising and marketing styles" without having to re-establish trademark rights in an equivalent trademark. *See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999).

253.    ATLAS LOGISTICS and ATLAS are legal equivalents, just as *ServiceMASTER Clean* and *ServiceMASTER* were found to be legal equivalents, and just as AMERICAN SECURITY BANK and AMERICAN SECURITY were found to be legal equivalents. *Am. Sec. Bank,* 571 F.2d at 567. Moreover, Plaintiffs are not latecomers to the market for Logistics Services but have been using ATLAS for those Services since at least 1970. *See also In re Dixie Rests., Inc.*, 105 F.3d 1405, 1407 (Fed. Cir. 1997); *In re Detroit Athletic Co.*, 903 F.3d 1297, 1304 (Fed. Cir. 2018).

254.    Because the commercial impression of ATLAS and ATLAS LOGISTICS is the same, Plaintiffs can tack their use of ATLAS LOGISTICS onto their prior use of ATLAS, which gives them priority over Defendants. And because of Defendants' admission of a likelihood of confusion, Plaintiffs are entitled to an injunction against Defendants' use of ATLAS LOGISTICS.

255.    Defendants' counsel suggested during closing argument that the USPTO had previously rejected a similar tacking argument Plaintiff AWGI made when it applied to register ATLAS LOGISTICS but was initially rejected because another company had already registered TELE ATLAS LOGISTICS. (Defendants' Closing Argument, Trial Tr., vol VI, 66-69; Ex. 28, at AWGI000134 and 148). Defendants' counsel told the Court that the Plaintiff's tacking argument

was "rejected then by the Trademark Office and it should be rejected now." (Defendants' Closing Argument, Jan. 30, 67-69).

256.    The USPTO Examining Attorney, however, did not reject Plaintiff's argument on its merits. Instead, she said only the argument is "not relevant" because she "has no authority to review or to decide on matters that constitute a collateral attack on the cited registration." (Ex. 28, at AWGI000130).

257.    Moreover, although the file history of Plaintiff's ATLAS LOGISTICS trademark application was admitted into evidence, Defendants adduced no trial testimony from any witness about the Examining Attorney's initial rejection (eventually withdrawn) based on the TELE ATLAS LOGISTICS registration. Defendants' counsel's statements during closing argument about parts of the file history that received no attention during trial do not constitute evidence.

### RELIEF

258.    The foregoing Findings of Fact and Conclusions of Law establish that Plaintiffs are entitled to judgment in their favor on Counts I, II, III and IV of Plaintiffs' Complaint.

259.    The Court will also enter judgment in Plaintiffs' favor on Counts I and III of Defendants' Counterclaims.

260.    As a result, and pursuant to the parties' stipulation (ECF No. 111), the Court finds that Plaintiffs are entitled to injunctive relief. The Lanham Act gives this Court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). The scope of the injunction depends on: "the manner in which the plaintiff is harmed, the ways in which the harm can be avoided, the viability of the defendant's defenses, the burden that would be placed on the defendant and the potential effect upon lawful

competition between the parties." *CFE Racing*, 793 F.3d at 595–96 (quoting *ProNational Ins. Co. v. Bagetta*, 347 F. Supp. 2d 469, 472 (E.D. Mich. 2004)).

261.   A trademark owner suffers irreparable harm when it loses control over the reputation of its trademark, because the loss of control over one's reputation is neither calculable nor precisely compensable. *CFE Racing*, 793 F.3d at 596.

262.   The Court finds that Plaintiffs' trademark rights will be protected by a Permanent Injunction, which will be filed separately from these Findings of Fact and Conclusions of Law, and which the Court has closely tailored to address the Plaintiffs' harm. *Id*. at 595.

## CONCLUSION

For the reasons above, the Court **DENIES** all pending motions and concludes that (1) the parties simultaneous use of the relevant marks is likely to cause consumer confusion; (2) Plaintiffs have priority to the relevant marks because of their prior use; and (3) even if Plaintiffs had not used the relevant marks first, Plaintiffs have priority by virtue of tacking and their decades-old use of ATLAS in the Transportation and Logistics industries. Accordingly, the Court **FINDS** in favor of Plaintiffs, and **AGAINST** Defendants, on Counts I, II, III, and IV of Plaintiffs' Complaint and Counts I and III of Defendants' Counterclaim. The Court will issue a separate permanent injunction, prohibiting Defendants from using certain ATLAS marks in the Transportation or Logistics industries.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  June 30, 2020